Craton LIDDELL, et al., Plaintiffs,

v.

The BOARD OF EDUCATION OF the CITY OF ST. LOUIS, et al., Defendants. (Two Cases)

The BOARD OF EDUCATION OF the CITY OF ST. LOUIS, STATE OF MISSOURI, Appellant,

v.

CITY OF ST. LOUIS; United States of America; the State of Missouri; Arthur Mallory, Commissioner of Education of the State of Missouri, in his official capacity; the State of Missouri Board of Education; Christopher S. Bond, Governor of the State of Missouri; John Ashcroft, Attorney General of the State of Missouri; Melvin E. Carnahan, Treasurer of the State of Missouri; John A. Pelzer, Commissioner of Administration of the State of Missouri; the State of Missouri Board of Education and its members, Delmar A. Cobble (President), Robert L. Welling (Vice-President), Terry A. Bond, Roseann Bentley, Dan L. Blackwell, and Donald E. West, Appellees. (Two Cases)

The BOARD OF EDUCATION OF the CITY OF ST. LOUIS, STATE OF MISSOURI, Appellee,

v.

CITY OF ST. LOUIS; United States of America; the State of Missouri; Arthur Mallory, Commissioner of Education of the State of Missouri, in his official capacity; the State of Missouri Board of Education; Christopher S. Bond, Governor of the State of Missouri; John Ashcroft, Attorney General of the State of Missouri; Melvin E. Carnahan, Treasurer of the State of Missouri; John A. Pelzer, Commissioner of Administration of the State of Missouri; the State of Missouri Board of Education and its members, Delmar A. Cobble (President), Robert L. Welling (Vice-President), Terry A. Bond, Roseann Bentley, Dan L. Blackwell, and Donald E. West, Appellants.

Craton LIDDELL, Kendra Liddell, minors, by Minnie LIDDELL, their mother and next friend, and Minnie Liddell; Roderick D. LeGrand, a minor, by Lois LeGrand, his mother and next friend, and Lois LeGrand; Clodis Yarber, a minor, by Samuel Yarber, his father and next friend, and Sam Yarber; Earline Caldwell; Lillie Mae Caldwell; Gwendolyn Daniels; and the National Association for the Advancement of Colored People, Appellants,

v.

The STATE OF MISSOURI; Arthur Mallory; Commissioner of Education of the State of Missouri, in his official capacity; the State of Missouri Board of Education; Christopher S. Bond, Governor of the State of Missouri; John Ashcroft, Attorney General of the State of Missouri; Melvin E. Carnahan, Treasurer of the State of Missouri; John A. Pelzer, Commissioner of Administration of the State of Missouri; the State of Missouri Board of Education and its members, Delmar A. Cobble (President), Robert L. Welling (Vice-President), Terry A. Bond, Roseann Bentley, Dan L. Blackwell, and Donald E. West, Appellees.

Nos. 84–2175, 84–2232, 84–2233 and 84–2242.

United States Court of Appeals, Eighth Circuit.

Submitted Jan. 16, 1985.

Decided March 26, 1985.

Opinion on Denial of Rehearing En Banc June 11, 1985.

See also, 8th Cir., 553 F.2d 557, 8th Cir., 693 F.2d 721, D.C., 505 F.Supp. 654.

Kenneth Brostron and Michael Hoare, St. Louis, Mo., for appellants.

Robert Dierker and Robert Presson, St. Louis, Mo., for appellees.

Before HEANEY, ROSS and McMILLIAN, Circuit Judges.

HEANEY, Circuit Judge.

This matter is before this Court on appeals by the Board of Education of the City of St. Louis and Craton Liddell, et al., and a cross-appeal by the State of Missouri. The appellants seek to set aside or modify several district court orders which they contend are inconsistent with this Court's en banc opinion of February 8, 1984, *Liddell v. State of Missouri* (*Liddell VII*), 731 F.2d 1294, *cert. denied,* —— U.S. ——, 105 S.Ct. 82, 83 L.Ed.2d 30 (1984), and to have this Court require the district court to enter orders which will assure that the Board of Education can fund the desegregation budget without harming the general education programs of the city schools. The State seeks to set aside an order of the district court which requires it to reimburse the City Board for certain desegregation transportation expenses for the school year 1983–84. We turn directly to the issues as the history and background of the desegregation dispute are thoroughly documented in earlier opinions of this Court. *See Liddell VII,* 731 F.2d at 1298–1301 & n. 1.

## I. QUALITY EDUCATION PROGRAMS.

### A. Nonintegrated Schools.

The plan for integrating the St. Louis schools approved by this Court recognized that at least 10,000 and perhaps as many as 15,000 black students would continue to attend all-black schools (nonintegrated) for the foreseeable future—even if every element of the plan, including intra- and interdistrict transfers and creation of magnet schools was successfully implemented. In recognition of this fact, the district court fully approved the settlement agreement insofar as it related to quality improvements in the nonintegrated schools.[1] In affirming this decision, we stated:

> We think that the district court's order is fully supported as it relates to the quality improvements in the nonintegrated schools. Neither the State, the United States, nor the City specifically objects to these improvements. Moreover, they are consistent with the testimony of every expert witness that testified. The reduction in class-size was viewed by the witnesses for the black plaintiffs as critical to raising the achievement levels of black students. The programs designed to intensify remedial instruction, encourage parental involvement, and promote a positive learning climate reflect the objectives that the Supreme Court approved in [*Milliken v. Bradley*, 433 U.S. 267, 97 S.Ct. 2749, 53 L.Ed.2d 745 (1977)]

> *Milliken II.* * * * The schools of emphasis assist in providing equal educational opportunity by providing alternative education options for black students unable to attend magnet schools. The motivational programs are designed to bring about productive attitudes towards learning, and are essential in the opinion of expert witnesses called by the black plaintiffs. [Citations omitted.]

*Liddell VII*, 731 F.2d at 1316.

To insure careful planning and efficient implementation, we permitted the City Board to initiate programs that were not in effect as of February 8, 1984, at the beginning of the 1984–85 school year rather than in the middle of the 1983–84 school year. We also permitted the Board to phase in the reduction in class size to a 20:1 pupil-teacher ratio over a four-year period beginning in 1984–85, and to phase in the schools of emphasis over a two-year period beginning in 1984–85. We further stated that the sum budgeted for Item B.1.01, coordination of instruction, should be reduced by one-half because expert testimony indicated that the program could be successfully accomplished for that amount. No issue is raised with respect to the "B" programs on appeal.

■ What is at issue in this appeal is whether the State of Missouri can be required to pay one-half the cost of the programs in the "A" series (A.1.01 through A.8.15)[2] in the *nonintegrated schools*.

---

1. The programs for the nonintegrated schools were identified in the budget submitted to this Court as being in the "B Series." They included:

> B.1.01–Reduction of Class Size
> B.1.02–Coordination of Instruction
> B.2.01–After School
> B.2.02–Saturday Classes
> B.2.03–Summer School
> B.2.04–Schools of Emphasis
> B.2.05–Parental Involvement
> B.2.06–Peer Tutoring
> B.2.07–Shared Motivation
> B.2.08–Role Model
> B.3.01–Parent–Staff

The parties estimated that, if the district court's orders with respect to the "B" programs were implemented in full for the 1984–85 school year, the total cost would be about $15 million, to be divided equally between the City Board and the

State. The actual cost for the 1984–85 school year is estimated to be between $5 million and $7 million. The cost of these programs will be increased for the 1985–86 school year because of a further reduction in class size, and full implementation of the schools of emphasis program.

2. The "A" series included those programs which were to be put into effect in all city schools, integrated and nonintegrated alike. These programs are listed in *Liddell VII*, 731 F.2d at 1312, and need not be restated here. The parties estimated that if the district court's order were to be implemented in full, the cost of these programs in 1984–85 would be approximately $59 million. We disapproved of shared State and City Board funding for many of these programs. The record does not clearly indicate the amount actually being spent on these programs

The State's position is that it can only be required to pay its share of the costs of those programs in that series that were specifically approved by this Court in its en banc opinion in *Liddell VII*, or those necessary for the city schools to retain a AAA status. The City Board, on the other hand, contends that the State must pay its share of all programs in the "A" series in the nonintegrated schools. Both parties cite *Liddell VII* in support of their point of view. The district court agreed with the State.

We acknowledge that *Liddell VII* is not entirely clear on this subject. We now clarify that opinion and hold that the State can be required to pay one-half the cost of those programs in the "A" series which were *in effect* in the nonintegrated schools at the time of our en banc opinion. No one suggested or intimated, by brief or in oral argument to the en banc Court, that programs already in place in the nonintegrated schools would or should be discontinued, and we did not intend to indicate in our opinion that the State could withdraw its financial support for these programs. On the other hand, the only *new* programs that we authorized for the nonintegrated schools were those in the "B" series, or those in the "A" series which were specifically approved or were found to be necessary to retain a class AAA status for the city schools.

We are unable to tell from the record presented to us which, if any, of the programs in the "A" series were in effect in the nonintegrated schools as of the date of *Liddell VII*, or which programs were in effect during the 1984–85 school year. It is the responsibility of the City Board to identify these programs and to estimate their cost for the 1984–85 school year. The City Board is entitled to have those programs which were in effect as of February 8, 1984, continue for the 1984–85 school year, and to have half the cost of these programs paid for by the State. If the City Board discontinued any of these programs for the 1984–85 school year because the State refused to pay its share, it is entitled to have those programs reinstated for the 1985–86 school year and to have the State pay for half their cost. Any dispute as to which programs were in effect in the nonintegrated schools as of February 8, 1984, or as to their cost, shall be fully presented to the Budget Review Committee for prompt resolution. The district court shall resolve any remaining disputes.

### B. Integrated Schools.

The State is required to pay one-half of the cost of the quality education programs in the integrated schools, *only* to the extent that these programs were specifically approved in *Liddell VII*,[3] or were necessary to permit the city schools to retain their Class AAA status. In this connection, the State of Missouri is to apply the same standards to the city schools in determining their AAA status as it uses for the other schools in the state. Further, the State may not relax its accreditation standards simply to avoid its constitutional obligations to desegregate the schools in the City of St. Louis.

### 1. *Library, Media, and Audio Visual Services (Library Services).*

The primary dispute concerning the maintenance of AAA status for the St. Louis schools involves library services budget items A.2.01 and A.2.02. A brief history of the background of this dispute will be helpful in understanding the issue.

The Missouri Department of Elementary and Secondary Education published a handbook for classification and accreditation of

---

for the 1984–85 school year. It would appear to be about one-third of the sum originally authorized by the district court.

**3.** We approved the following programs in *Liddell VII:* A.4.01, pre-school centers; A.1.01, planning and program development; A.4.02, all-day kindergarten (to be implemented over a period of at least two years); A.8.05, parental involvement; A.8.13, desegregation planning; A.8.15, long-range planning; and A.8.06, public affairs. The State is obligated to fund one-half of the reasonable and necessary actual cost of these programs.

public school districts in Missouri in 1980. The record does not indicate that a handbook bearing a later date has been published. This handbook states that school districts are classified and accredited upon the basis of both objective and subjective standards. The handbook provides that schools will be classified as either AAA or AA. If the school district fails to meet either AAA or AA standards, it will be rated U (unclassified).

For a number of years, the State classified the St. Louis school system as AAA. While the record is not entirely clear as to when this classification was changed, the district court in its order of July 11, 1984, H(3220)84, stated in footnote 2 as follows:

> The court notes that the classification rating for the City's public school system

was reduced when the need to attract interdistrict transfers was high, during the development and initial implementation of the 12(c) Settlement Plan. The classification was raised to a AAA rating promptly after the United States Court of Appeals for the Eighth Circuit, during oral argument on this case, inquired whether a AAA rating would constitute a reasonable criterion by which to determine the quality of education within the City's schools.

The original reclassification apparently took place on March 31, 1983. On that date, the State Board of Education classified the St. Louis school system as AA. A chart accompanied the classification. That chart, insofar as it is relevant to the issue under consideration, was as follows:

| Standards For | Principals | Teachers | Learning Resources Libraries Media Personnel | Teaching Load | Pupil Personnel Services | Curriculum |
|---|---|---|---|---|---|---|
| Elem.Sch. K–5 | AAA | AAA | U | U | AA | AA |
| Mid/Jr.Sch. 6–8 | AAA | AAA | AA | AA | AA | AAA |
| High Sch. 9–12 | AAA | AA | AAA | AA | AAA | AAA |

The report also stated that certain items should be corrected and fully met before the next school year opened unless a previous agreement for progressively planned improvements had been made with the supervisor of instruction. The items referred to were: (1) class size; (2) the absence of counselors in elementary schools; (3) the failure to provide instruction in art and music; and (4) deficiencies in learning resources, libraries, and media personnel. The State evaluators commented as follows:

> III–3—Adequate and appropriate textbooks and other classroom learning resources should be provided in an equitable manner in each classroom or instructional area to enable the instructional staff to effectively meet the individual needs of the students.
>
> Library resources in the elementary schools should be provided to meet the

AA standards outlined in the *Media Standards for School Learning Resources Centers*. Budget expenditures for libraries need to be increased to provide adequate resource materials and equipment to adequately support the instructional program.

> Librarians should be provided in the regular elementary school buildings to meet AA standards.
>
> IV–3—Adequate and appropriate textbooks and other classroom learning resources should be provided in an equitable manner in each classroom or instructional area to enable the instructional staff to effectively meet the individual needs of the students.
>
> Library resources in the middle schools should be improved to meet AA standards outlined in the *Media Standards for School Learning Resources Centers*. Budget expenditures for libraries need to

be increased to provide adequate resource materials and equipment to adequately support the instructional program.

The services of a .50 FTE librarian should be provided at Long Middle School.

V–3—Adequate and appropriate textbooks and other classroom learning resources should be provided in an equitable manner in each classroom or instructional area to enable the instructional staff to effectively meet the individual needs of the students.

Library resources in the high schools should be improved to meet AAA standards outlined in the *Media Standards for School Learning Resources Centers.* Budget expenditures for libraries need to be increased to provide adequate resource materials and equipment to adequately support the instructional program.

When the matter came before this Court en banc we stated that there was strong support in the record for approving those programs necessary to permit the city schools to regain and then retain their AAA status. We noted that the city schools had been denied this rating because of the deficiencies noted above. We stated in a footnote that the State recently restored the city schools to a AAA status. Notwithstanding that fact, we stated:

In light of the foregoing discussion, we approve the district court's funding order insofar as it relates to programs necessary to the city schools to retain their AAA rating. While the record is not entirely clear as to precisely what programs the State required the City Board to institute to regain this rating, it appears that they are budget items A.2.01, library and media services; A.2.02, audio visual services; A.3.01, lower class size; and A.3.02, restoration of art, music, and physical education. It is the intention of the Court that these budget items be implemented only insofar as necessary for the city schools to retain their AAA status.

*Liddell VII,* 731 F.2d at 1318.

The parties, in response to an inquiry by this Court, stated that if the district court's order with respect to budget items A.2.01 and A.2.02, library services, were to be fully implemented, the cost would be approximately $9 million in the school year 1984–85, with this cost to be shared by the City Board and the State.

On remand, the City Board reduced this estimate to $7.4 million. The State of Missouri objected to this sum and the matter was eventually submitted to the magistrate. The magistrate in his report to the district court stated that the *only issue* between the State and the City Board was the amount of money necessary to bring library services up to the AAA rating. He stated that the City Board's position was that it would cost $7.4 million in 1984–85 to reach this goal, and that the State's position was that only $4.89 million was required for this purpose.

The magistrate specifically found that adequate library services are necessary for the city schools to attain and maintain a AAA rating and that all of the categories budgeted for these services were necessary. He stated, however, that the full amount requested by the City Board was not required because significant economies could be achieved by redistribution of books. He recommended that the City Board budget for the items in dispute be set at $5.5 million to be phased in over four years.

Thereafter, the State filed exceptions to the magistrate's report. It asked the district court to require the City Board to spend $1.2 million of the $1.375 million annual installments for books, materials, and supplies called for in the self-evaluation forms and to expend no more than $0.15 million on furniture and other items.

When the matter reached the district court, it appears that there was some confusion between the parties as to what the magistrate had recommended. The City Board took the position that the parties had

agreed that it was necessary to spend $4.89 million for library services in the 1984–85 school year and that an additional $5.5 million ($1.375 million per year) be spent beginning in 1984–85 for additional library services over a four-year period. The district court took what appears to be a middle position and stated that he read the magistrate's report as recommending that a total of $10.39 million be spent for library services over the four-year period beginning with the 1984–85 school year, or an annual sum of $2.6 million. He noted that he would review this allocation annually. The City Board appeals from the district court's decision. Its position appears to be that the magistrate required the City Board to spend $6.175 million per year for a four-year period to bring library services to the AAA level. It argues that this Court should require these expenditures to be made and asks us to require the State to pay one-half of the cost.

The State did not appeal the district court's order. It rather states: "In short, given the fact that as a district the City of St. Louis School District is rated AAA, the State does not believe the court's approval of a budget in excess of $10 million over the next four years for library services can be said to be in violation of this court's directive."

We accept the district court's determination that the sum of $2.5 million should be spent for the school year 1984–85, with the State obligated to pay one-half of that amount. These monies, to the extent that they have not already been spent, will be spent for those functions and services which will correct the deficiencies found by the State in the City Board's library services. With respect to the remaining three years, we remand to the district court with directions to it to determine more precisely the additional library services that are necessary to permit the city schools to retain their AAA rating. We repeat, that in making this determination, the district court is to require the State of Missouri to apply the same standards to the St. Louis school system that it uses for other schools in the state. We also note, from reading the State's evaluation report and the record, that some of the expenditures are of a capital nature and need only be made once or, at the most, periodically. Others are of an operating and maintenance nature that need to be made each year. The district court should frame its ultimate order accordingly. On remand, the district court may refer this matter to the Budget Review Committee for its recommendation.

### 2. *All-Day Kindergarten Program.*

The dispute with respect to the all-day kindergarten program involves the interpretation of *Liddell VII.* In that opinion, we stated:

> [W]e find adequate support in the record for all-day kindergartens (budget item A.4.02, $6,129,000) * * *. The all-day kindergarten program serves several important compensatory and remedial objectives. Much of the testimony at the fairness hearings emphasized the importance of focusing desegregation efforts on the earlier grades, as younger children have developed fewer racial prejudices and differences in performance are narrower. * * * The additional instruction time will also assist in building prerequisite skills for city pupils. The testimony also emphasized that many of the children came from single-parent families that did not provide them with the skills which would permit them to compete with other children at the first-grade level. * * * The all-day kindergarten program is an expensive one which must be implemented carefully if waste is to be avoided, and the full benefits of the program realized. We therefore direct that the program be phased in over a period of at least two years. [Citations omitted.]

*Liddell VII,* 731 F.2d at 1317.

We find no support in the *Liddell VII* opinion for the State's position that it is only obligated to fund one-half of the difference between what the City Board paid for a half-day kindergarten program in 1983–84, and the cost of a full-day kinder-

garten program in 1984–85. In *Liddell VII,* our Court specifically recognized that the budget for the all-day kindergarten program for 1984–85 was $6,129,000—the amount the City Board had estimated for the full and reasonable costs of the all-day program—and required the State to pay one-half of those costs. *Liddell VII,* 731 F.2d at 1317. We also ordered that this program be phased in over a period of at least two years. *Id.* The State is, of course, only obligated to pay for one-half of the necessary and reasonable actual cost of the all-day kindergarten program, not one-half of the estimate. The record does not permit us to state accurately the cost allocated to the State.

### 3. *Other Programs in the "A" Series.*

█ The City Board argued to the court below that several additional "A" programs should be implemented as being essential to the desegregation of the city schools. It asked the district court to conduct an evidentiary hearing to permit it to prove the constitutional necessity of these additional programs. The district court refused. We do not believe that the district court abused its discretion in so doing. The Board's immediate task is to implement fully and carefully the program approved in our en banc opinion. This is a comprehensive and expensive program which should be implemented and evaluated before additional elements are added to it. Obviously, neither this Court nor the district court can nor would prevent the plaintiffs from requesting additional relief to remedy any remaining constitutional deficiencies. But the district court need not grant evidentiary hearings unless a clear showing of constitutional need is made. The task of the City Board is already a huge one: It must reduce class size, implement new full- and part-time programs, develop magnet schools, participate in the planning necessary to receive and send pupils to suburban schools, and begin the capital improvements constitutionally required at the earliest opportunity.

## II.  MAGNET SCHOOL PROGRAMS.

█ The parties agree that the City Board and the State are to share equally in the capital and operating costs of magnet school programs established during or prior to the 1982–83 school year. We held in *Liddell VII* that the State was obligated to fund one hundred percent of the operating and capital costs of the magnet schools instituted thereafter. *Liddell VII,* 731 F.2d at 1311. We also made it clear that no new magnet schools were to be instituted or existing magnet schools replicated without careful planning and study. We provided that these new magnet programs must be reviewed and approved by the Magnet Review Committee and the district court. Finally, we indicated that only those magnet schools which have a reasonable likelihood of attracting suburban students should be approved. *Id.*

With these principles restated, we resolve the questions raised on appeal as follows:

A. The physical condition of magnet schools existing during or prior to the 1982–83 school year must be approved. It is the responsibility of the City Board and the State to share the costs of such capital improvements.

B. It is the responsibility of the State to pay the full capital and operating costs of magnets established under the settlement agreement.

C. The State is required to pay its share of the reasonable capital and operating expenses of these magnet school programs without an arbitrary dollar limit on these costs. This Court has already placed significant limits on the development of magnet schools which will hold costs at a reasonable level, including requirements:

1. that new magnet schools must show a reasonable probability of attracting a significant number of suburban students (This decision is to be made initially by the Magnet Review Committee, and reviewed by the district court on the request of a party to this litigation.);

2. that the programs must be educationally sound and that the expenses incurred must be reasonable (The reasonableness of the expenses is to be initially addressed by the Budget Review Committee if the parties are unable to agree.);

3. that new schools should be implemented in reasonably steady increments over a period of four years; and

4. that there is a ceiling of 14,000 on the number of students to be enrolled in city magnets.

As we said in *Liddell VII*, for the magnet schools to contribute to the desegregation process, they must have "individualized teaching, a low pupil-teacher ratio, specialized programs tailored to students' interests, enriched resources and active recruitment." *Liddell VII*, 731 F.2d at 1311. We emphasize that these requirements apply to both the specialized and the general curriculum of the magnet schools.

### III. PART–TIME INTEGRATIVE PROGRAMS.

■ The district court imposed a $1 million limit on the funding of all part-time integrative programs. The City Board contends on appeal that this limitation is improper, and we agree. In *Liddell VII*, we stated:

> we rather require the City Board to resubmit to the Budget Review Committee * * * a list of the new or expanded programs that they would propose to implement. The total cost of these programs should not exceed $1 million.

*Liddell VII*, 731 F.2d at 1312.

We did not intend that the $1 million limit apply to both existing and new or expanded part-time integrative programs. We thus reverse the district court's order imposing such a limitation; the district court shall only apply the $1 million to new or expanded programs.

### IV. INTRA–CITY TRANSPORTATION.

Both the State and the City Board object to the district court's order of August 28, 1984, concerning the funding of student transportation under the intra-city desegregation plan. The dispute involves the State's withholding of a 1982–83 transportation aid payment of $714,725 (which was due in the 1983–84 school year) and the method of determining the proper aid payments in light of both regular and desegregation transportation needs.

In 1980, the district court provided that

> The State of Missouri is ordered to fund one-half of the cost of implementing and operating the Board's Desegregation Plan[.] * * * The sum ordered to be paid herein will include the additional dollars for transportation requested in the Desegregation budget. * * * Payment by the State to the Board of Education of the City of St. Louis for the costs of the Desegregation Plan shall be in addition to the payments heretofore made by the State to the said Board, as well as any increase in those sums as the Board would have received absent this Order.

*Liddell v. Board of Education,* 491 F.Supp. 351, 353 (E.D.Mo.1980).

In *Adams v. United States,* 620 F.2d 1277 (8th Cir.), *cert. denied,* 449 U.S. 826, 101 S.Ct. 88, 66 L.Ed.2d 29 (1980), we held that "[t]ransportation costs incurred pursuant to the provisions of an approved plan will be paid by the Board of Education," although we noted that federal and state aid would be available to the City Board for this purpose. *Id.* at 1297 & n. 33.[4] In 1981 and again in 1982, our Court affirmed as a general matter that the State is required to pay for one-half of the actual costs of desegregating the City schools. *Liddell v. Board of Education (Liddell V),* 677 F.2d 626, 631 (8th Cir.1982), *cert. denied,* 459 U.S. 877, 103 S.Ct. 172, 74 L.Ed.2d 142 (1983); *Liddell v. Board of Education (Liddell III),* 667 F.2d 643, 654–55 (8th Cir. 1981), *cert. denied,* 454 U.S. 1081, 1091, 102 S.Ct. 634, 656, 70 L.Ed.2d 614 (1982). We did not, however, specifically address the

---

**4.** Very little, if any, federal aid is now available to the City Board for transportation.

300

district court's May, 1980, intra-city transportation funding order in these or subsequent opinions.

The City Board interprets the May, 1980, order as requiring the State to pay half of the desegregation transportation costs in the year these expenses are incurred. According to the City Board, however, this order also requires that the State include these same desegregation transportation costs in determining the City Board's regular transportation aid for the following year. This apparently has been the practice up until the 1984–85 school year.

█ The State, on the other hand, maintains that the May, 1980, order does not require that desegregation transportation costs be included for purposes of determining regular transportation aid as this practice results in double reimbursement to the City Board. Consequently, the State withheld $714,725 in transportation aid payments from the City Board for the 1982–83 school year.

The district court ordered that the State pay to the City Board the disputed $714,725 in transportation aid because it found that the City Board had a legitimate expectation in this payment based on past practice. It also ordered, however, that beginning with the 1984–85 school year, desegregation-related transportation costs, pursuant to the intra-city plan, were to be omitted from the desegregation budget, and were instead to be included in the City Board's application for regular state transportation aid.

The record indicates that the financial adviser recommended the change in the method of determining transportation aid in order to reflect more accurately a "shared total responsibility between local district and State to provide every student safe access to his/her assigned school"— which is the original central purpose of school transportation. This method also avoids duplicative State funding of desegregation transportation costs, so that no State foundation (or general operating) money will flow directly or indirectly into the intra-city desegregation budget.

We find that the district court's order concerning the method of determining intra-district transportation aid for the 1984–85 school year is, with the exceptions noted below, consistent with our prior holdings and should be implemented. The excep-

tions are: first, under the present state transportation aid formula, the State pays aid in partial reimbursement for only "allowable" transportation costs. These "allowable" costs, however, may not include all costs necessary to effectuate the desegregation plan. These "nonallowable" transportation costs are part of the State's obligation to pay one-half of the costs of desegregating the city schools and must be paid in addition to the regular state transportation aid. We leave it to the Budget Review Committee and the district court to determine which transportation costs meet this standard. Second, as part of the State's responsibility to pay one hundred percent of the costs of the new magnet schools approved under the settlement agreement and the part-time integrative programs, the State is obligated to pay one hundred percent of the costs of transporting students participating in these programs. Because the State is required to pay the full costs of these programs, the costs will be excluded in determining regular transportation costs.

We conclude that the district court erred in granting the City Board's motion to compel payment of the $714,725. This payment is inconsistent with our prior holdings concerning the State's obligation to pay for one-half of desegregation costs and results in a double payment to the City Board. The transportation aid for the 1982–83 and 1983–84 school years must be recomputed in accordance with this opinion, and the State must be required to pay any balances due to the City Board on the basis of this recomputation.

V. FINANCING DESEGREGATION.

In *Liddell VII*, we outlined the steps for the district court to follow in insuring that the City Board had sufficient revenue to meet its share of desegregation costs:

the district court should, first, promptly determine the amount of money that will be required in 1984–85 to fund the desegregation order and it should subsequently determine the funds necessary for each of the succeeding years. Second, the district court should determine whether the City Board is able, with its own resources, to fund its share of the costs. * * * Third, if the district court determines that the City Board lacks re-

sources sufficient to fund its share of the desegregation order, it shall consider alternative sources of revenue. * * * Fourth, if the voters refuse to approve a higher tax levy, or if the legislature fails to authorize the City Board to raise taxes from non-property tax sources, or if the City Board and the State, as joint tortfeasors, are unable to agree on an alternate method of raising the City Board's share of the cost, the district court shall conduct an evidentiary hearing and thereafter enter a judgment sufficient to cure the constitutional violations which we have found in a manner consistent with this and prior opinions.

*Liddell VII*, 731 F.2d at 1323.

The financing dispute in the present appeal concerns whether the City Board had sufficient revenue to fund its share of the desegregation budget for the 1984–85 school year. The City Board estimates a budget shortfall for 1984–85 of $16.9 million. The State estimates a shortfall of less than $1 million, and argues that this sum is so insignificant in comparison to the City Board's entire budget that no funding order should be required.

On November 9, 1984, the district court estimated that the shortfall for 1984–85 would be $19.5 million. On December 19, 1984, the district court revised its estimate of the deficit to $22.2 million. It based its estimate for the school year 1984–85 on the following projections:

**Expenditures:**

| | |
|---|---|
| General Operating Budget | 156.3 M |
| Desegregation costs | 25.8 M |
| | 182.1 M |

**Revenues:**

| | |
|---|---|
| Tax Receipts (Based on a $2.90 rate) | 147.2 M |
| Additional Transportation Receipts | 7 M |
| Surplus Available | 8.5 M |
| Anticipated Fiscal Incentives | 3.4 M |
| | 159.8 M |
| Estimated Shortfall | 22.3 M |

Both the City Board and the State quarrel with this projection. The City Board states that tax revenues will be less than estimated, that the surplus is encumbered and cannot be used to meet the City Board's share of the desegregation costs, and that the State refuses to pay the City Board the fiscal incentives due it as a sending school district. The State, on the other hand, contends that the surplus available exceeds that shown by the district court. Both parties agree that the millage increase approved by the voters will make approximately $13.7 million available to the City Board not shown in the district court's estimates.

■ We are simply unable to resolve the conflicts on the basis of the record presented to us. Only one thing is fully apparent, and that is that as of December 17, 1984, the date of the district court's revised order, the City Board did not have sufficient funds to meet its share of the desegregation budget. We thus have no alternative but to remand this matter to the district court with directions to it to direct the Budget Review Committee to promptly:

(1) Determine as accurately as it can the City Board's expenditures and revenues for the 1984–85 school year. In making this computation, the Committee shall consider the impact of this decision on expenditures and revenues. In this respect, we note that the State will be required to pay to the City Board additional funds for the following programs:

- Quality Education Programs in the Nonintegrated Schools Existing on February 8, 1984;
- Library Services;
- All-Day Kindergarten;
- Magnet Schools;
- Part-time Integrative Programs; and
- Intra-City Transportation.

The Committee shall also determine the amount of fiscal incentives due the City Board by the State.

(2) Determine whether the City Board has unencumbered fund balances that can be used by it to fund its desegregation obligations.

(3) Make a prompt report to the district court with respect to its findings, detailing any unresolved factual or legal disputes.

Thereafter, the district court shall promptly resolve any disputes unresolved by the Budget Review Committee and enter appropriate orders. If it determines that the City Board does not have sufficient funds to meet its share of the desegregation budget, it shall, after a hearing, enter whatever order is necessary to permit the City Board to meet its obligation.

Steps must also be taken to avoid a repetition of the funding problem for the 1985–

86 school year. The City Board shall promptly submit a realistic 1985–86 budget to the Budget Review Committee, which shall promptly review this budget and report to the district court any disputes which remain. The district court shall resolve these disputes promptly so that when the 1985–86 school year begins, the City Board will have its finances securely in place.

There remains the question of the capital improvements needed to address the constitutional deficiencies in the St. Louis school facilities. In *Liddell VII*, we noted that the city schools are in a condition of "old age, rapid deterioration, and extreme deferred maintenance." *Liddell VII*, 731 F.2d at 1318. We noted that several bond issues had been submitted to the city voters and that each of them had been rejected. We suggested that the City Board submit a smaller bond issue to the voters. The City Board ignored this suggestion and submitted another large bond issue to the voters which they rejected.

The financial adviser has recommended on several occasions that a bond issue of $20 million be issued without a vote of the people, as this amount would have continued the debt service levy for the City Board at a rate which was required to retire a 1964 bond issue in 1984. It is now agreed that any bond issue, even for an amount which maintains a prior debt service levy, must have the approval of two-thirds of the voters. We note, however, that counsel for the City of St. Louis stated at oral argument that a Court-ordered bond issue in this amount would be "a more limited intrusion" which the City would likely not contest.

The record in this case also reveals that: (1) even if the settlement plan is fully implemented, there will be 14,000 students attending magnet schools, and from 10,000 to 15,000 black students in the nonintegrated schools; (2) the facilities for the nonintegrated schools are either the worst or among the worst in the City; and (3) the facilities for the existing magnet schools and those approved by the Court are entirely inadequate.

In light of these circumstances, the district court shall on remand direct the City Board to prepare promptly a building program not to exceed $40 million to meet the most urgent capital needs of the district, with emphasis on the all-black schools

and the magnet schools. After the City Board prepares this program, it shall submit the program to the Budget Review Committee. The Budget Review Committee shall assume that all projects are necessary but review the cost figures in the plan to ensure they are reasonable. The district court shall then conduct a hearing on the plan in order to determine that all projects in it are necessary to cure constitutional deficiencies in the City Board's facilities. If the district court determines this question in the affirmative, it shall order the City Board to submit a bond issue of up to $20 million to the voters which will be matched by the State. If this bond issue fails to receive the necessary two-thirds majority, then, pursuant to our opinion in *Liddell VII*, 731 F.2d at 1323, the district court shall enter a judgment against the City Board in the amount determined and in an equal amount against the State, in order to cure those constitutional deficiencies that can be cured with the money available. We recognize the need for long-term planning, and that should proceed, but the needs of the all-black schools appear to be so obvious that they should be met at the earliest possible time.

The City Board shall also prepare a capital improvement plan for new magnet schools authorized under the settlement agreement and approved by the Magnet Review Committee. This plan, entirely separate from the $40 million program discussed above, shall be submitted to the Magnet Review Committee and the Budget Review Committee, and then to the district court. The State shall be liable for the entire cost of the approved projects.

## VI. CONCLUSION.

Progress is being made in desegregating the schools of St. Louis. The quality of education in the all-black schools is improving and will improve further as class size is reduced and as the programs authorized by the Court are fully implemented.

Approximately 8,000 students now attend the magnet schools in the city. While only 500 of these are from the suburbs, this number will increase if the facilities are promptly improved and the quality of the programs offered is enhanced. Part-time integrative programs in the city schools are providing opportunities for integrative learning experiences to the black students who attend nonintegrated schools. Approximately 5,000 black students from

the city now attend schools in the suburbs. This number is expected to increase by nearly 3,000 in the 1985–86 school year. The transfers not only help to desegregate the St. Louis Schools, but also assist in the integration of the suburban schools.

The Budget Review Committee has done an excellent job of analyzing the cost of the various programs and in making recommendations to the district court with respect to these costs. The Committee could be of even greater service if it made a greater attempt to resolve conflicts between the City Board and the State, and if it provided more detailed information to the district court as to the cost implications of those disputes that it was not able to resolve.

Magistrate David Noce has provided valuable assistance to the district court in hearing disputes between the City Board and the State, and in making recommendations to the district court with respect to these disputes. This Court continues to question the wisdom of using a magistrate for this purpose, however, particularly in view of the fact that the Budget Review Committee is available to make a detailed analysis of the financial impact of the disputes. The Budget Review Committee, of course, cannot make recommendations as to legal issues involved. Notwithstanding our preference that magistrates not be used in this case, we leave the ultimate decision of this matter to the district court.

Serious problems remain. No progress has been made towards correcting the serious deficiencies that exist in school facilities. It seems impossible to obtain the two-thirds vote necessary to approve a bond issue to fund these improvements. We have addressed this issue in our opinion and are hopeful that it will be resolved in the near future.

While the transfer of black students to the suburban schools appears to be proceeding as planned, the transportation problem has not been solved. Parents continue to question the convenience and reliability of the system, and the State continues to question the cost of the system. Continuing efforts must be made to provide a cost-efficient and convenient system.

The State of Missouri continues to object to the overall cost of the plan, and the City Board continues to find it difficult to resolve the inevitable tensions that arise within the school system because of the demands for higher salaries by personnel and the requirement that it meet the desegregation goals established by this Court. These objections and conflicts are the inevitable result of decades of discrimination against the black children of St. Louis, and can only be resolved if the City Board, the State, the suburban schools, the parents and the teachers dedicate themselves to providing quality, integrated educational opportunities to black and white students alike.

The mandate of this Court shall issue forthwith. The City of St. Louis, City Board, and State shall each bear their own costs for this appeal. The State and City Board shall share equally in bearing the costs of the Caldwell-NAACP plaintiffs.

### ORDER

The petition of the State of Missouri to rehear en banc this Court's panel opinion of March 26, 1985, has been considered by the Court and is denied.

The motions of the City of St. Louis and the Board of Education of the City of St. Louis to recall the mandate issued pursuant to this Court's March 26, 1985, panel opinion and to rehear that case for the purpose of clarifying the opinion have been considered by the panel that wrote that opinion (Judges Heaney, Ross and McMillian) and are granted in part and denied in part by that panel as set forth below.

#### 1. *Magnet Schools*

The Court intends that the total enrollment of the intracity magnet schools be held to approximately 8,000 students. Within this 8,000 limit, the City Board is free to modify or substitute magnet programs in light of changing conditions in order to meet the ongoing needs of the school children. The State will continue to be responsible for funding these intracity magnet schools pursuant to the formula heretofore established by the district court. This responsibility includes that of funding one-half of the cost of improving or renovating the facilities used by the magnet schools.

Interdistrict magnets created under the settlement agreement may only be created when the Magnet Review Committee and the district court determine that there is a "reasonable probability of attracting suburban white students" to these schools. *Liddell v. State of Missouri*, 731 F.2d 1294, 1312 (8th Cir.) (en banc), *cert. denied*, — U.S. —, 105 S.Ct. 82, 83 L.Ed.2d 30 (1984).

The total enrollment of these interdistrict magnets shall not exceed 6,000 students. The State is obligated to pay the full operating and capital costs of these magnet schools.

### 2. Capital Improvements

The Court adheres to the views set forth in the panel opinion. *See Liddell v. Board of Education,* 758 F.2d 290, 302–03 (8th Cir.1985). This order is without prejudice to the City Board to submit to the district court proposals for an additional bond issue or issues to correct any remaining constitutional deficiencies found by the district court to exist in the facilities of the City schools. The City Board remains free to submit a bond issue of any amount which would not be matched by State funds.