801 F.2d 278
 35 Ed. Law Rep. 35
 Craton LIDDELL, et al
v.
The BOARD OF EDUCATION OF the CITY OF ST. LOUIS, MISSOURI, et al.
The BOARD OF EDUCATION OF the CITY OF ST. LOUIS, State of
Missouri, Appellant,
v.
The STATE OF MISSOURI; Arthur Mallory, Commissioner of
Education of the State of Missouri, in his official
capacity; The State of Missouri Board of Education; John
Ashcroft, Governor of the State of Missouri; William
Webster, Attorney General of the State of Missouri; Wendell
Bailey, Treasurer of the State of Missouri; Stephen C.
Bradford, Commissioner of Administration of the State of
Missouri; The State of Missouri Board of Education and its
members Erwin A. Williamson (President), Jimmy Robertson
(Vice-President), Grover A. Gamm, Delmar A. Cobble, Dale M.
Thompson, Donald W. Shelton and Robert Welling, Appellees.
The BOARD OF EDUCATION OF the CITY OF ST. LOUIS, State of
Missouri, Appellee,
v.
The STATE OF MISSOURI; Arthur Mallory, Commissioner of
Education of the State of Missouri, in his official
capacity; The State of Missouri Board of Education; John
Ashcroft, Governor of the State of Missouri; William
Webster, Attorney General of the State of Missouri; Wendell
Bailey, Treasurer of the State of Missouri; Stephen C.
Bradford, Commissioner of Administration of the State of
Missouri; The State of Missouri Board of Education and its
Members, Erwin A. Williamson (President), Jimmy Robertson
(Vice-President), Grover A. Gamm, Delmar A. Cobble, Dale M.
Thompson, Donald W. Shelton and Robert Welling, Appellants.
 Nos. 85-2194, 85-2275.
 United States Court of Appeals,
Eighth Circuit.
 Submitted June 9, 1986.
Decided Sept. 5, 1986.
Rehearing Denied Nov. 6, 1986.
 
 Kenneth C. Brostron, St. Louis, Mo., for appellant/cross appellee, Bd. of Educ.
 Robert Presson, Asst. Atty. Gen., Jefferson City, Mo., for appellee/cross appellant, State of Mo.
 Before HEANEY, Circuit Judge, FLOYD R. GIBSON, Senior Circuit Judge, and WOLLMAN, Circuit Judge.
 HEANEY, Circuit Judge.
 
 
 1
 The St. Louis school desegregation case is before this Court for the ninth time.[1] Our past opinions have purposely left a great deal of discretion to the parties to this action. Although it would be preferable to continue that course, we must be more precise if the decisions of this Court to integrate the St. Louis school system are to be fully and fairly implemented.
 
 
 2
 Notwithstanding our lack of precision, significant progress towards integration has been made. In the school year 1985-86, nearly 7,000 black students from the City of St. Louis attended schools in the suburban districts. Most students who transferred have remained in the school to which they have transferred. Ninety-two percent of them were promoted to the next highest grade in the school that they were attending. More than 60,000 students are involved in part-time integrative programs. The interdistrict transportation system is functioning with increasing efficiency. The pupil/teacher ratios in the nonintegrated schools of the City of St. Louis have been reduced from thirty-five students per teacher to twenty-five students per teacher at the elementary level, and from thirty-five students per teacher to twenty-nine students per teacher at the middle school level. The ratio in the nonintegrated high schools has significantly improved. Class size in the integrated schools has also been reduced. Moreover, nearly 7,000 students are now attending intra-district magnet schools in the City of St. Louis, with enrollment approximately equally divided between black and white students.
 
 
 3
 There are, however, some areas where little or no progress has been made. A needed capital improvement program for the nonintegrated schools and the magnet schools has yet to be implemented. The magnets have not been successful in attracting suburban white students. In the 1985-86 school year, only approximately 115 suburban white students were attending interdistrict magnets, and only approximately 375 suburban white students were enrolled in the intradistrict magnets. Furthermore, the City Board and the State continue to dispute their respective responsibilities for funding the various programs required by this Court.
 
 
 4
 No point would be served by again reviewing the long history of racial discrimination in the St. Louis school system or in restating our prior opinions. We turn instead to the questions raised on this appeal and answer them as explicitly as we can.
 
 
 5
 I. RESPONSIBILITY OF THE PARTIES WITH RESPECT TO FUNDING THE REDUCTION IN PUPIL/TEACHER RATIOS IN INTEGRATED AND NONINTEGRATED SCHOOLS.
 
 
 6
 A. The nonintegrated schools.
 
 
 7
 It is the responsibility of the State of Missouri to fund one-half of the cost of reducing the pupil/teacher ratio in the nonintegrated elementary and middle schools of the St. Louis school system from thirty-five to one to twenty to one over a four-year period (1984-85 through 1987-88). To reach this goal, the class size in these schools in the 1986-87 school year should not exceed twenty-four to one. Teachers employed in the remedial and compensatory programs mandated by this Court's prior opinions are not to be included in determining pupil/teacher ratios.
 
 
 8
 On the basis of the data submitted to this Court, it appears that there were 584 teachers employed in the nonintegrated elementary and middle schools in the base year (1982-83). They taught a total of 20,499 students. In the 1985-86 school year, 600 teachers were similarly employed in teaching 16,133 students. The pupil/teacher ratio in the base year was thirty-five to one, and had declined to twenty-seven to one by 1985-86. If the teacher numbers exclude those in remedial and compensatory programs, the State is obligated to pay one-half the cost of sixteen additional teachers for the year 1985-86. If such teachers have been included, the computation must be redone.
 
 
 9
 The method of computation we use is, with the exception of the exclusion of compensatory and remedial program teachers, that urged by the State and approved by the chairperson of the Budget Review Committee (BRC) and the district court. The City objects to its use. It contends that in computing the State's obligation, we should assume that the same number of students are currently enrolled as were enrolled in 1982-83, the base year. Using this computation (without considering the necessity of rounding up for fractional requirements at each school), 159 additional teachers would be required to reach the required ratio in the elementary and middle nonintegrated schools in the 1985-86 school year. We cannot accept the City Board's theory. The en banc Court anticipated that enrollment in the nonintegrated schools would decline over the years as more and more black students transferred from the City of St. Louis to the suburbs, and as the number of black students in the magnet schools increased. Liddell v. State of Missouri, 731 F.2d 1294, 1316 (8th Cir.) (en banc ) (Liddell VII ), cert. denied, 467 U.S. 1225, 105 S.Ct. 82, 83 L.Ed.2d 30 (1984). We note that the State is required to pay the full cost of educating the black students in the suburbs and educating students in the interdistrict magnets. It is also required to pay the St. Louis City School District one-half the state aid it would otherwise receive for the students that transfer to the suburbs. Under these circumstances, it would be inappropriate to use the formula the City Board suggests. However, no adjustments in state payments are to be made for any year preceding the 1985-86 school year even though the formula urged by the City Board was used in those years.
 
 
 10
 It is the further responsibility of the State of Missouri to fund one-half of the cost of reducing the pupil/teacher ratio in the nonintegrated high schools of the St. Louis school system to the point where these ratios are at AAA standards. The City Board argues that this Court intended that the pupil/teacher ratios in the nonintegrated high schools would be reduced to a twenty-to-one ratio. While the en banc opinion is not clear in this regard, the State in our view has properly interpreted the opinion as requiring that AAA standards be met. However, the allowance of rounding up and exclusion of compensatory and remedial program teachers must be taken into account.
 
 
 11
 B. The integrated schools.
 
 
 12
 The primary responsibility of the State of Missouri with respect to funding the reduction in class size in the integrated schools is to provide the funds necessary to reduce the pupil/teacher ratio to the AAA level. Liddell v. Bd. of Educ., 758 F.2d at 290, 294, modified on rehearing, 758 F.2d 303 (8th Cir.1985) Liddell VIII; Liddell VII, 731 F.2d at 1317-18. This level is thirty-to-one for elementary and middle schools, and thirty-five-to-one for high schools. The State accepts this responsibility, but questions the logistics of counting the teachers. We hold that in determining whether AAA ratios have been met, remedial and compensatory teachers required by this Court's earlier opinions are to be excluded. See Liddell VIII, 758 F.2d at 294-98. Fractional requirements at each school must be rounded up, and allowance must be made for the fact that collective bargaining agreements limit the number of hours that each teacher may teach.
 
 
 13
 II. MAGNET SCHOOLS.
 
 
 14
 A. Interdistrict Magnets.
 
 
 15
 The State and the Board continue to have serious differences with respect to the planning, operation, and funding of the magnet schools, particularly the interdistrict magnets. The State argues that the Board is using the interdistrict magnets as a method of requiring the State to pay 100 percent of the cost of educating City students, that the magnets are not attracting county students as anticipated, and that the schools are poorly planned and operated. The City Board, on the other hand, contends that its efforts to implement effective interdistrict magnets are continuously frustrated by the state's objections to its proposals and the State's refusal to pay for adequate facilities and programs.
 
 
 16
 The present appeal involves disputes over (1) the facilities for five new interdistrict magnets[2] (the total sum involved in this dispute is $20.2 million); (2) the continued funding of the Humboldt visual and performing arts and the Roosevelt foreign language programs (the sum involved in this dispute is $2 million); and (3) architectural and engineering services (primarily for Humboldt) (the sum involved in this dispute is $4.8 million).
 
 
 17
 Before considering these disputes specifically, it is imperative to restate this Court's views with respect to the interdistrict magnets and to answer basic questions that continue to arise.
 
 
 18
 (1) The currently operating interdistrict or settlement-plan magnets are: Foreign Language Experience (Roosevelt), Investigative Learning Center (Mason), Military Middle (Pruitt), Visual and Performing Arts I (Marquette), Visual and Performing Arts II (Humboldt), Academy of Basic Instruction (Lyon), and Individually Guided Education (Woerner).[3]
 
 
 19
 (2) The City Board, the State and the suburban school districts have an obligation to work together in planning and operating interdistrict magnets. Until now, the State has mainly reacted to the City Board's proposals, usually negatively, and the suburban school districts have been largely indifferent to the planning and operating process.
 
 
 20
 (3) Interdistrict magnets should not be approved unless there is a reasonable probability that the magnet will enroll a significant number of white suburban students. To be more specific, there should be a reasonable probability that at least forty percent of the white students will be residents of the suburbs (this is essentially the standard suggested by the State). To achieve this goal, suburban school administrators, teachers, parents and representatives of the State must be involved in the planning process for curriculum, facilities and transportation, and in the recruitment process. Footdragging cannot be tolerated. The goal must be to have at least 2,000 more students in interdistrict magnets by the opening of the 1987-88 school year and a total of 6,000 students in these magnets by the 1989-90 school year. Unless these goals are met, the burden of integrating the St. Louis schools will have been primarily borne by the black students of St. Louis. This cannot be tolerated.
 
 
 21
 (4) Existing interdistrict magnets will be expected to meet the goal that forty percent of the white students be from the suburbs by the opening of the 1988-89 school year. New interdistrict magnets will be expected to meet the same goal by the beginning of each school's third year of operation. If a particular magnet does not meet its goal, the State may move the district court to have that magnet converted to an intra-district magnet or terminated. The State's cooperation with the City Board in reaching the enrollment goals shall be considered an important element in deciding to convert or terminate a magnet. It would be unfair to change the status of a magnet or close it if the State were partially responsible for its failure to meet the goal.
 
 
 22
 (5) The State is obligated to fund 100 percent of the capital and operating costs of the interdistrict magnets. The magnet schools are to feature individualized teaching, a low pupil/teacher ratio (this ratio to be the same as the ratio for the nonintegrated schools at the same grade level), specialized programs tailored to student resources, enriched resources, and active recruitment. Moreover, these requirements are to apply to both the specialized and the generalized curriculum. See Liddell VIII, 758 F.2d at 299; Liddell VII, 731 F.2d at 1311. Students will not choose to attend a magnet school that offers them a specialized curriculum but does not have a strong basic education program.
 
 
 23
 (6) The interdistrict magnet school facilities must be well designed, clean and attractive, and they must have adequate indoor and outdoor recreational facilities. The plain fact is that recruitment of suburban students will be difficult, if not impossible, unless the physical facilities are reasonably comparable with those of the suburban districts from which the students are transferring and are well located from the point of view of both City and county students.
 
 
 24
 (7) The Voluntary Interdistrict Coordinating Council has played an important role in the successful transfer of City students to the county. It should be similarly involved in the reverse transfers to City magnets. The district court should promptly require the State to provide the resources to the Council to permit it to fulfill this role.
 
 
 25
 Although these general principles should resolve the issues before us, we specifically direct that within thirty days after the receipt of this opinion, an expanded Magnet Review Committee shall reconsider the City Board's proposals for the five new interdistrict magnets previously recommended by the Board and all issues collateral to that decision. The Committee shall, within sixty days, approve the proposals, modify them or recommend others that will make most likely the achievement of the goals outlined herein. In this regard, careful study must be given to both curriculum and facilities, and resources must be made available immediately by the State so that the study can be promptly completed. With respect to class size in the generalized curriculum, the pupil/teacher ratio shall be the same as that approved for the nonintegrated schools.[4] With respect to facilities for proposed interdistrict magnets, consideration should be given to constructing a new facility for each school, or constructing a single educational park for the approved schools (the latter being the recommendation of Dr. Warren Brown, Chairman of the BRC) or thoroughly rehabilitating existing facilities to house the students. The ultimate choice should be consistent with the goals outlined above. Thereafter, the matter shall be promptly presented to the district court for action by it. We are confident that it will rule on the matter promptly, and that construction will be commenced without delay. Construction of magnet facilities should not await action on a bonding program for other schools. We recognize that this decision will cause some delay, but better delay than continuing failure.
 
 
 26
 B. Intra-District Magnets.
 
 
 27
 It is the responsibility of the State to fund one-half of the operating and capital costs of the intra-district magnets. See, e.g., Liddell VIII, 758 F.2d at 298, 303. Several disputes have arisen over the State's obligation in this regard. First, the Board contends that the State has an obligation to fund one-half of the total operating costs of these schools, including the specialized programs and the general curriculum. We agree with this contention. Magnet schools cannot be successful unless all programs at such schools are of the highest quality.
 
 
 28
 In a similar view, the Board contends that the pupil/teacher ratio in the general curriculum offered to the students at the magnet schools should be identical to that required for the nonintegrated schools. The state disagrees, taking the position that the pupil/teacher ratio for the basic courses in the magnet schools should instead be that necessary to meet AAA standards. In this Court's en banc opinion, Liddell VII, we stated:
 
 
 29
 Magnet schools under this plan will be distinguished by the features that have made them successful in other cities: individualized teaching, a low pupil-teacher ratio, specialized programs tailored to students' interests, enriched resources and active recruitment.
 
 
 30
 731 F.2d at 1311.
 
 
 31
 In Liddell VIII, we further emphasized that "these requirements apply to both the specialized and the general curriculum of the magnet schools." 758 F.2d at 299. This language seems clear, but we again state that beginning in the 1986-87 school year, the pupil/teacher ratios in the general curriculum in the magnet schools are to be the same as those in the nonintegrated schools at the comparable grade level.
 
 
 32
 III. THE CAPITAL IMPROVEMENT PROGRAM.
 
 
 33
 In Liddell VII, we made clear that it was the State's responsibility to fund one-half of the cost of a capital improvement program designed to bring the St. Louis school system into compliance with the Constitution. 731 F.2d at 1319. We noted that several bond issues had been submitted to the voters and rejected. We suggested that the City Board submit a smaller bond issue to the voters. In Liddell VIII, we noted that the Board had rejected our suggestion. We then directed that the Board submit a $20 million bond issue to the voters to be matched by an equal contribution by the State of Missouri. 758 F.2d at 302. The Board did not comply. Instead, an even larger bond issue was submitted to the voters and again rejected.
 
 
 34
 We now direct that upon receipt of this opinion, the Board of Education of the City of St. Louis shall prepare a capital improvement program for the nonintegrated elementary and middle schools which is estimated to cost not more than $40 million. It shall provide for the replacement or complete rehabilitation of the buildings and grounds of those nonintegrated elementary and middle schools which (1) are in the worst physical condition, and (2) are so located that the best available demographic studies indicate that they will continue to serve students for the foreseeable future. This program should be presented to the district court within thirty days of the receipt of this decision. (The parties have advised this Court that a comprehensive study and report of repairs to the entire school system has already been accomplished.) Thereafter, the district court shall promptly either approve the program as submitted or make such modifications in the program as it feels necessary to carry out the mandate of this Court. At the earliest possible date after such approval, a bond issue for the sum of $20 million shall be submitted to the voters of the City of St. Louis. If the voters fail to approve the issue by the required majority, the district court shall follow the course set forth in this Court's en banc opinion in Liddell VII, 731 F.2d at 1323, as reiterated in Liddell VIII, 758 F.2d at 302.
 
 
 35
 We regret the necessity of being so specific, but it appears that differences of opinion between the parties and in the community with respect to the capital improvements are so great that no progress will be made unless we take this action. It certainly is to the credit of the City Board, the mayor, the City Council, and church and civic leaders that they have attempted to persuade the voters of the City of St. Louis to voluntarily support a more comprehensive program. Unfortunately, despite their heroic efforts, the last bond issue was defeated as badly as similar earlier efforts, and the black children of St. Louis are still required to attend a school in a unconstitutional setting. This situation can no longer be permitted to continue.
 
 
 36
 IV. NURSING.
 
 
 37
 The City Board contends that the district court erred in approving the Budget Review Committee's elimination of system-wide nursing services from the fifty percent State-funded budget.
 
 
 38
 In Liddell VII, 731 F.2d at 1312, we mentioned "additional nursing and counseling staff" as one of the system-wide "A" series quality education improvements approved by the district court. We then stated, however, that:
 
 
 39
 We cannot fully agree with the district court's conclusion that all of ["A" series] quality education improvements in all schools are closely related to the integration process. * * * A review of the record leaves us with the firm conviction that the district court erred in approving many of the programs in the quality education budget.
 
 We then stated:
 
 40
 There is strong support in the record for approving those programs necessary to permit the city schools to regain, and then retain, their Class AAA status. * * * The City Board was denied this rating because its classes were too large, it had too many uncertified teachers, it lacked counselors in the elementary grades, it did not provide art, music and physical education in the elementary grades, and its library and media services were inadequate.
 
 
 41
 We then found sufficient support in the record for state funding of preschool centers, planning and program development, all-day kindergartens, parental involvement, desegregation planning and public affairs. Although we did not specifically disapprove fifty percent State funding for the expanded nursing services, we implied that nursing services were not sufficiently related to the integration process to receive fifty percent State funding.
 
 
 42
 In Liddell VIII, we were again faced with a budgetary dispute. The State contended that, for the nonintegrated schools, it can only be required to pay its share of the costs of those programs in the "A" series that were specifically approved by this Court in its en banc opinion in Liddell VII or those necessary for the City schools to retain Class AAA status. The City Board contended that the State must pay its share of all programs in the "A" series in the nonintegrated schools. We held that
 
 
 43
 the State can [only] be required to pay one-half the cost of those programs in the "A" series which were in effect in the nonintegrated schools at the time of our en banc opinion. * * *
 
 
 44
 We are unable to tell from the record presented to us which, if any, of the programs in the "A" series were in effect in the nonintegrated schools as of the date of Liddell VII, or which programs were in effect during the 1984-85 school year. It is the responsibility of the City Board to identify these programs and to estimate their cost for the 1984-85 school year. The City Board is entitled to have those programs which were in effect as of February 8, 1984, continue for the 1984-85 school year, and to have half the cost of these programs paid for by the State. If the City Board discontinued any of these programs for the 1984-85 school year because the State refused to pay its share, it is entitled to have those programs reinstated for the 1985-86 school year and to have the State pay for half their cost. Any dispute as to which programs were in effect in the non-integrated schools as of February 8, 1984, or as to their cost, shall be fully presented to the Budget Review Committee for prompt resolution. The district court shall resolve any remaining disputes.
 
 
 45
 Liddell VIII, 758 F.2d at 294.
 
 
 46
 Thereafter, the district court directed the BRC to "determine and resolve promptly any dispute(s) as to which ["A" series quality education] programs were in effect in the nonintegrated schools as of February 8, 1984, and as to the costs thereof." L(158)85, dated April 12, 1985. After hearing from the parties, the BRC chairperson suggested
 
 
 47
 that the Court use the following criteria for identifying an "A" component which was in effect in nonintegrated schools as of February 8, 1984. The component and function were (1) approved in the 1983-84 Settlement Plan budget; (2) presented to the Eighth Circuit for its consideration; and (3) budgeted in Fund 40 [the budget fund City Board uses to record quality education program finances shared by the City Board and the State]. Further (4) some expenditure or encumbrance had been made in such component or function before February 8, 1984; and (5) such expenditure was made directly in support of the nonintegrated schools.
 
 The BRC chairperson reasoned that
 
 48
 [f]rom an administrative viewpoint, a program cannot be considered to be in effect until an expenditure or an encumbrance (a commitment to expend) has been made. In this case, the encumbrance must have been made from Fund 40. If mere budgeting of a function placed it in effect, the Eighth Circuit would not have needed further assistance in resolving this issue. * * *
 
 
 49
 If planning were a criterion, then all originally budgeted programs would be considered in effect. Certainly some tentative planning was required to set budget authorizations. Activities associated with planning--such as recruitment, interviewing and surveying needed resources--are commonly performed in school districts for programs that may not materialize. Until a definite dollar outlay has been committed, the program is not in effect.
 
 
 50
 The BRC then concluded that the "A" series nursing program was not "in effect" at the time Liddell VII was announced and thus eliminated that program from the fifty percent State-funded budget. The district court adopted the BRC's five-prong test of which programs were "in effect" and affirmed the exclusion of the nursing program.
 
 
 51
 The City Board now attempts to frame the issue on appeal to be whether the expanded nursing program is necessary for the nonintegrated schools to meet Class AAA standards. However, we are foreclosed by our opinion in Liddell VIII from adopting this approach. Under that opinion, whether or not the "A" series nursing program may receive fifty percent State funding turns on whether that program was in effect at the time of Liddell VII. The City Board does not make a serious challenge to the BRC's five-prong test as adopted by the district court. Its only argument is that the nursing program was "in effect" because, as of February 6, 1984, $292,700.83 had been expended from its general budget on nursing services in the City schools, apparently both integrated and nonintegrated. We find that the BRC's five-prong test is a reasonable method of applying Liddell VIII' § "in effect" test, and we affirm the district court's affirmance of the BRC's conclusion that the "A" series nursing program was not "in effect" at the time of Liddell VII.
 
 
 52
 V. ELEMENTARY ART, VOCAL MUSIC AND PHYSICAL EDUCATION.
 
 
 53
 The City next contends that the district court erred in accepting the BRC's reduction of the amount the City requested for elementary art, vocal music, and physical education. The City argued that it needed $4,184,368 to meet Class AAA standards, and the State proposed $3,135,140. The City's request was based on staffing formulas identical to those used in 1983 and 1984 when the State found that the St. Louis schools did not meet AAA standards in those areas. The state based its request on 1984-85 staffing levels, plus 4.5 percent for inflation. The Budget Review Committee deferred to the State's request on the ground the State could best interpret AAA standards, and it stated that it lacked evidence that more lax standards were applied to St. Louis schools than schools elsewhere in the state. The district court affirmed on this same ground and authorized $3,135,140, but suggested that increased funding might be obtained by the City if the State's amount proved insufficient.
 
 
 54
 On appeal, the City contends that the BRC and district court improperly rubber-stamped the State's proposal without analysis, and that the State failed to analyze whether its budget figures would allow the City to meet AAA standards. The City also attacks the State's failure to supply an alternative formula for determining AAA staffing levels, and cites language from the State's 1985 classification report on City schools that the City's elementary art, vocal music and physical education programs have not yet met AAA standards. Finally, the City argues that because of required class-size reductions, it must actually exceed AAA standards for art, vocal music and physical education, and that the State's budget figure fails to account for this.
 
 
 55
 We find merit in the City's position. First of all, it was improper for the BRC and district court to conclude without analysis or supporting evidence that the State's figure was correct because the State is in the best position to determine whether the St. Louis school's elementary art, vocal music and physical education programs meet AAA standards. The State must provide a reasoned rationale on how its budgetary figures will allow the City to meet AAA standards and any additional requirements established by this Court's class-size reduction standards.[5]
 
 
 56
 Second, neither the BRC nor the district court discussed the state's 1985 classification report which the City alleges admits that the City's 1984-85 program for elementary art, vocal music and physical education failed to meet AAA standards. Finally, the BRC and the district court must be cautious of any attempt by State officials to lessen AAA standards to avoid desegregation funding obligations.
 
 
 57
 In sum, we find that the State's budget figure for elementary art, vocal music and physical education may be inadequate and lacks sufficient support in the record to show that it will allow the City to meet AAA standards and the additional obligations imposed by our class-size reduction requirements. Because the record lacks evidence on the appropriate amount, we remand to the district court for further consideration of this issue.
 
 
 58
 VI. SPECIAL EDUCATION.
 
 
 59
 The State, on its cross appeal, contends that the district court erred in failing to allow it credit toward its funding obligation for special education programs under the settlement plan, for the additional State aid which these programs generate. At issue are four budget items for additional classes for mentally retarded and speech-impaired students and resource teachers for mentally retarded students. The total cost of these programs was budgeted at $3,075,733 for which the State was fifty percent responsible. However, under Mo.Rev.Stat. Sec. 162.975 (1978), the City Board would also be entitled to $913,556 in state categorical aid for these special education programs. The State contended below that it could meet its liability of $1,537,866 by providing $913,556 in categorical aid and $624,310 in desegregation aid. The City Board contended that the State was liable for $1,537,866 in desegregation aid, plus the $913,556 in categorical aid, for a total of $2,451,423.
 
 
 60
 The district court agreed with the City Board, finding that the $913,556 was a source of outside funding under Liddell v. Bd. of Educ., 677 F.2d 626, 631 (8th Cir.) (Liddell V ), cert. denied, 459 U.S. 877, 103 S.Ct. 172, 74 L.Ed.2d 142 (1982), and Liddell v. Bd. of Educ., 567 F.Supp. 1037, 1056 (E.D.Mo.1983). In Liddell V, we held that the State's funding share should not be reduced by any grants or contributions received by the City Board to the extent the funds were used to defer actual costs of programs approved by the district court. 677 F.2d at 631. In Liddell v. Bd. of Educ., 567 F.Supp. at 1056, the district court held that any outside funds for approved programs should be applied first to reduce the City Board's share of a program's cost and then to reduce the State's share.
 
 
 61
 On appeal, the State contends that the district court erred in treating the issue as one of outside funding. It contends that Liddell V' § reference to outside funding applied to grants or contributions received from sources other than the State. It contends that the issue is instead controlled by Liddell VIII' § prohibition of "double payment" through desegregation aids and State categorical program aids. 758 F.2d at 300. There, the State contended that its fifty percent share of intra-City desegregation transportation costs should be reduced by any normal State transportation aids provided to the City on the basis of the City Board's half of the budget. We agreed with this contention with two minor exceptions. Id.
 
 
 62
 We now agree with the State's argument that the special education funding issue is governed by Liddell VIII' § prohibition of double funding. If the State were held liable for one-half of the special education budget items ($1,537,867) plus $913,556 in categorical aid, the City Board would receive a total of $2,451,423 out of a total budget of $3,075,733. This would make the State liable for approximately eighty percent of the costs of these special education programs when it should only be liable for fifty percent of these costs. Accordingly, we hold that the State may meet its $1,537,867 share of the $3,075,733 special education budget for the four programs at issue by paying the City Board $913,556 in categorical aid, plus $624,310 in desegregation aid. These principles shall also be applied to future budget disputes. See Liddell VIII, 758 F.2d at 300. But see Liddell V, 677 F.2d at 631.
 
 
 63
 Affirmed in part, reversed in part and remanded for further proceedings consistent with this opinion. The State and the City Board shall each bear their own costs and attorneys fees with respect to this appeal, and shall equally bear the costs and attorneys fees incurred on appeal by amicus, the National Association for the Advancement of Colored People.
 
 
 
 [1]
 See Liddell v. State of Missouri, 731 F.2d 1294, 1298-1301 & n. 1 (8th Cir.) (en banc ) (Liddell VII ), cert. denied, 467 U.S. 1225, 105 S.Ct. 82, 83 L.Ed.2d 30 (1984), where we recounted the procedural history of this case in detail. We have subsequently announced one additional opinion, Liddell v. Bd. of Educ., 758 F.2d 290 (8th Cir.), modified on rehearing, 758 F.2d 303 (8th Cir.1985) (Liddell VIII )
 
 
 [2]
 These are: a Microcomputer Magnet, a Classical Junior Academy, a Montessori Magnet, an Investigative Learning Center, and an Aerospace Magnet School
 
 
 [3]
 The interdistrict magnets currently enroll approximately 2,016 students--1,039 black and 977 white--only 115 of the white students, or twelve percent, are from the suburbs
 
 
 [4]
 With respect to other quality education programs, they shall generally be as directed for the nonintegrated schools, but the district court may, in its discretion, decide that one or more of these programs is not required in light of the circumstances at each particular school
 
 
 [5]
 To some degree, the budgeting pressures created by the need to reduce class sizes in elementary art, vocal music and physical education will be compensated for by declining enrollment in City schools due to voluntary student transfers to suburban schools. To this extent, the State's funding obligation may be reduced in accordance with our discussion of the class-size reduction finding issue, supra