823 F.2d 1252
 40 Ed. Law Rep. 711
 In re Craton LIDDELL, et al. v. BOARD OF EDUCATION OF the
CITY OF ST. LOUIS, MISSOURI, et al.
BOARD OF EDUCATION OF the CITY OF ST. LOUIS, MISSOURI, Appellee,
v.
The STATE OF MISSOURI, Appellant.
In Re: Craton LIDDELL, et al. v. BOARD OF EDUCATION OF the
CITY OF ST. LOUIS, MISSOURI, et al.
BOARD OF EDUCATION OF the CITY OF ST. LOUIS, MISSOURI, Appellant,
v.
The STATE OF MISSOURI, Appellee.
Craton LIDDELL, et al. v. The BOARD OF EDUCATION OF the CITY
OF ST. LOUIS, MISSOURI, et al.
The BOARD OF EDUCATION OF the CITY OF ST. LOUIS, MISSOURI, Appellant,
v.
The STATE OF MISSOURI; Arthur Mallory, Commissioner of
Education of the State of Missouri, in his official
capacity; The State of Missouri Board of Education; John
Ashcroft, Governor of the State of Missouri; William
Webster, Attorney General of the State of Missouri; Wendell
Bailey, Treasurer of the State of Missouri; Stephen C.
Bradford, Commissioner of Administration of the State of
Missouri; The State of Missouri Board of Education and its
members, Erwin A. Williamson (President), Jimmy Robertson
(Vice-President), Grover A. Gamm, Delmar A. Cobble, Dale M.
Thompson, Donald W. Shelton and Robert Welling, Appellees,
Special School District of St. Louis County, Appellee.
 Nos. 86-2565, 87-1001 and 87-1705.
 United States Court of Appeals,
Eighth Circuit.
 July 7, 1987.
 
 Before HEANEY, McMILLIAN and FAGG, Circuit Judges.
 
 ORDER
 
 1
 This matter comes before the Court on appeals by the Board of Education of the City of St. Louis and by the State of Missouri. We issue this interim order to give the City Board, the State of Missouri and other interested parties time to implement the provisions of this order by the opening of the 1987-88 school year, and in time to permit the parties to take those steps which will further implementation of the plan to integrate the St. Louis City schools at the beginning of the 1988-89 school year.
 
 
 2
 A. Integration Requirements and Current Status
 
 
 3
 In Liddell v. State of Missouri, 731 F.2d 1294 (8th Cir.), cert. denied, 469 U.S. 816, 105 S.Ct. 82, 83 L.Ed.2d 30 (1984) (Liddell VII ), this Court, sitting en banc, set forth in detail the requirements for integrating the St. Louis City schools. We emphasize today that these requirements must be fulfilled even though this order may allow their fulfillment to be delayed in certain specific instances. The most important requirements and the ways to meet these requirements are set forth below.
 
 
 4
 (1) Pupil/teacher ratios in the nonintegrated elementary and middle schools were to be reduced to twenty to one by the beginning of the 1987-88 school year. Pupil/teacher ratios in the high schools and integrated elementary and middle schools were to be reduced to AAA standards. Liddell VII, 731 F.2d at 1314-18. Pupil/teacher ratios in the nonintegrated elementary and middle schools were about twenty-five to one in the 1986-87 school year. The City Board states that it cannot reduce these ratios to twenty to one in the 1987-88 school year, as required by Liddell VII, because of space and financial difficulties. Pupil/teacher ratios in the high schools and in the integrated elementary and middle schools have been reduced to AAA standards.
 
 
 5
 (2) Fifteen thousand (15,000) black students from the City were to be voluntarily transferred to suburban school districts. Id. at 1302. As of the 1986-87 school year, approximately 9,500 students had transferred. On the basis of past experience and applications received for enrollment for the coming school year, the number of black students transferring to county schools will probably continue to increase by about 2,000 per year and will probably exceed 11,500 in the 1987-88 school year.
 
 
 6
 (3) Fourteen thousand (14,000) students were to be enrolled in magnet schools--8,000 (city students) in the intradistrict magnets and 6,000 (city and county students) in the interdistrict magnets. Liddell v. Board of Education, 804 F.2d 500, 502 (8th Cir.1986) (Liddell X ). As of the 1986-87 school year, 6,500 students attended intradistrict magnet schools and 2,100 attended interdistrict magnet schools. This enrollment is not now expected to increase in the 1987-88 school year because the parties have been unable to agree upon the programs to be offered and in what facilities they would be offered.
 
 
 7
 (4) Remedial and compensatory programs, along with part-time integrative programs, were to be offered in nonintegrated schools. Liddell VII, 731 F.2d at 1314-18. Some of the required programs are now being offered and are adequately funded; others have yet to be offered; and still others are underfunded.
 
 B. Steps to be Taken
 
 8
 On the basis of the briefs and records presented to this Court, it does not appear that the pupil/teacher ratios in the City's nonintegrated elementary and middle schools will be reduced to twenty to one by the 1987-88 school year. It also does not appear that 15,000 black students will have transferred to the county schools or that magnet enrollment requirements will be met by the 1987-88 school year. We re-emphasize that these requirements of Liddell VII remain in effect and are to be met at the earliest possible time. We are also of the opinion that the twenty to one pupil/teacher ratio can be reached without split or dual sessions, without displacement of quality education programs in the nonintegrated elementary and middle schools, and without having to transport substantial additional numbers of students. To this end, we direct:
 
 
 9
 (1) At the beginning of the 1987-88 school year, black students currently being transported to nonintegrated schools outside of their attendance zone are to be transferred to those integrated schools in which significantly fewer than 50% of the students are expected to be black. The transfers are intended to bring the percentage of black students in these integrated schools up to about 50% of the student population. The transfers will make some additional space available in the nonintegrated elementary and middle schools for further reduction in pupil/teacher ratios.
 
 
 10
 (2) Even though the goal of twenty to one may not be fully achieved in the 1987-88 school year, it is apparent that some reduction in class size in the nonintegrated elementary and middle schools can be made at the beginning of the 1987-88 school year by making more efficient use of classrooms in the elementary and middle school buildings.
 
 
 11
 (3) Immediate steps must be taken to insure that facilities meeting constitutional standards are available to meet the twenty to one pupil/teacher ratios in the nonintegrated elementary and middle schools by the beginning of the 1988-89 school year. In this connection, the court understands that in some classrooms, for example, the ratio may be nineteen to one and in others twenty-one to one. It is the intent of this Court that there be a good faith effort to meet the twenty to one ratio in each classroom and that marginal variances will be tolerated.
 
 
 12
 In determining the facilities needed to reach the twenty to one pupil/teacher ratio in the nonintegrated elementary and middle schools, the parties are to assume--and accomplish as a fact--that by the 1990-91 school year, an additional 5,500 black City students will be attending county schools, that by the same year an additional 2,750 black City students will be attending magnet schools in the City, and that there will be some space available for additional black students in the integrated comprehensive schools. Thus, unless demographic factors clearly indicate otherwise, planning should assume that by 1990, fewer than 15,000 black students will be attending nonintegrated schools in the City.
 
 
 13
 (4) The record reveals that many of the nonintegrated elementary and middle schools are very small. For example, sixteen nonintegrated elementary schools have enrollments of fewer than 250 students per school, with an average enrollment of 170 students. The record also reveals that many of the nonintegrated elementary and middle schools are poorly maintained and located and would be very expensive to rehabilitate.
 
 
 14
 In its long-term planning for the nonintegrated elementary and middle schools, the City Board should carefully consider closing the smaller, poorly maintained and poorly located nonintegrated elementary and middle schools and consolidating the students in either new or existing buildings that are well located and designed specifically to meet a pupil/teacher ratio of twenty to one, the goal being to achieve significant operating savings while providing the students with suitable facilities.[1]
 
 
 15
 (5) The record further indicates that the City Board closed the 1986-87 school year with a substantial balance that can be used for any educational purpose.[2]
 
 
 16
 (6) We direct the district court to determine the amount of this balance and direct that not less than fifty percent of that balance be used to fund a portion of the City Board's share of the cost of providing the facilities set forth in paragraphs B(3) and B(4) of this order. We also direct the parties to determine the annual savings to the City Board from consolidating certain nonintegrated elementary and middle schools as discussed above. These savings are to be earmarked for assisting the City Board in retiring a bond issue necessary to finance its share of the capital improvements program. If the two sources identified above are insufficient to fund the City Board's $20 million share of a $40 million capital improvements program for the nonintegrated elementary and middle schools, the district court shall enter an order consistent with Liddell VII, 731 F.2d at 1319-23, Liddell v. Board of Education, 758 F.2d 290, 300-02 (8th Cir.1985) (Liddell VIII ), and Liddell v. Board of Education, 801 F.2d 278, 284 (8th Cir.1986) (Liddell IX ), to make the resources available to the City Board to retire the remainder of the bond issue.
 
 
 17
 (7) The district court is to determine the number of teachers necessary to reduce the present pupil/teacher ratios in the nonintegrated elementary and middle schools from approximately twenty-five to one to twenty to one. The City Board and the State are to share the cost of additional teachers equally. In determining this cost, the fact that the average pupil/teacher ratio in the high schools and integrated elementary and middle schools is lower than that required in Liddell VII is not to be given any weight. Although arguments can be made that either the City Board should be required to hire fewer teachers and thereby increase pupil/teacher ratios in the high schools and integrated elementary and middle schools, or that the State's funding obligation should be reduced, we are not willing to require either action. Nonetheless, no further reduction in pupil/teacher ratios in the high schools or in the integrated middle or elementary schools will be allowed until such time as each of the requirements of Liddell VII is met in the nonintegrated and magnet schools.
 
 
 18
 (8) We affirm the district court's order re-assigning the responsibility for developing a magnet school program to the newly constituted Magnet Panel. We further hold that reductions in pupil/teacher ratios in the magnet schools can wait until the Panel develops its long-range plan. (We, however, expect this plan to be completed with dispatch. Failure to do so will result in this court fixing an explicit timetable.) We emphasize that an important responsibility of the Panel will be to promptly resolve the disputes between the City Board and the State with respect to the facilities to house the intradistrict and interdistrict magnet schools. The record reveals that to reach the goals established by this Court of increasing the intradistrict magnet enrollment from 6,500 to 8,000, and increasing the interdistrict magnets enrollment from 2,000 to 6,000, the programs must be attractive to county parents and students, and the facilities must be well located and comparable to facilities in the county schools. Liddell v. Board of Education, 804 F.2d 500, 503 (8th Cir.1986) (Liddell X ); Liddell IX, 801 F.2d at 283; Liddell VIII, 758 F.2d at 299; Liddell VII, 731 F.2d at 1311. No delay in providing the necessary facilities is to be countenanced.
 
 
 19
 (9) We affirm the district court's decision requiring the State to pay one-half the intradistrict magnet specialty costs rather than one-half the general curriculum costs. We again call to the attention of the parties that the State is responsible for the total operating and capital costs of the interdistrict magnet schools. Liddell IX, 801 F.2d at 283; Liddell VIII, 758 F.2d at 298; Liddell VII, 731 F.2d at 1311.
 
 
 20
 We note the district court's concern with respect to the opportunities of white city students to attend magnet schools. We point out that when additional facilities are made available, as they must be, there will be space for an additional 750 white students from the City in intradistrict magnets and space for an additional 1,800 white students from the City in the interdistrict magnets.
 
 
 21
 The mandate of this Court with respect to this order shall issue immediately. An opinion with respect to the other issues raised in these appeals will be issued in due course. Costs will be taxed at the time the opinion of this Court is filed.
 
 
 
 [1]
 The sixteen smallest nonintegrated elementary schools had average enrollments in 1986-87 of about 170 students in grades one through five. (They have an average projected enrollment for next year, including kindergarten and special education students, of 196.) The sixteen schools had 100 non-teaching personnel (excluding teacher aides), or an average of just over six personnel per school in 1986-87
 The five largest nonintegrated elementary schools had an average enrollment of 448 in 1986-87. (They have an average projected enrollment for next year, including kindergarten and special education students, of 519.) These five schools had an average of just over nine non-teaching personnel (excluding teacher aides) per school. Thus, only three extra non-teaching personnel seem to be needed in elementary schools of more than twice the size. Clearly, substantial economies of scale could be realized, especially when utility and maintenance costs are included, if the small elementary school buildings were replaced with fewer, new or rehabilitated buildings of a larger size.
 Moreover, many students in the nonintegrated elementary schools are bused. By basing the building of new schools or the rehabilitation of old schools on projected population trends, the busing of students could be significantly minimized and further savings realized.
 Although there are not as many small, older nonintegrated middle schools as elementary schools, certain of these schools could be closed and the student bodies consolidated. For example, Yeatman had an enrollment last year of 439 and a non-teaching staff (excluding teacher aides) of about eleven. Hickey had an enrollment of 215 and a non-teaching staff (excluding teacher aides) of almost ten. A middle school of about twice the enrollment seems to need only about one more staff member to operate it.
 Again, when savings from reduced utilities, maintenance, and busing are included, substantial economies of scale could be realized if smaller schools could be consolidated.
 
 
 [2]
 It is difficult to determine fund balances at the end of the year from the financial records submitted to this Court. Exhibit 11 at page 11 states that the fund balance at the beginning of the 1985-86 school year was $19,995,082 and that the balance had risen to $21,921,516 by the end of the 1985-86 school year. The City Board stated at oral argument that the unencumbered balance at the end of the 1985-86 school year was only $7,074,287. It relied on pages 9 and 10 of Exhibit 11 to support this contention. It conceded that the balance at the end of the 1986-87 school year was about the same as it was at the beginning of the year