In Re Craton LIDDELL, et al.

v.

BOARD OF EDUCATION OF the CITY OF ST. LOUIS, MISSOURI, et al.

BOARD OF EDUCATION OF the CITY OF ST. LOUIS, MISSOURI, Appellee,

v.

The STATE OF MISSOURI, Appellant,

In Re Craton LIDDELL, et al.

v.

BOARD OF EDUCATION OF the CITY OF ST. LOUIS, MISSOURI, et al.

BOARD OF EDUCATION OF the CITY OF ST. LOUIS, MISSOURI, Appellant,

v.

The STATE OF MISSOURI, Appellee,

Craton LIDDELL, et al.

v.

The BOARD OF EDUCATION OF the CITY OF ST. LOUIS, MISSOURI, et al.

The BOARD OF EDUCATION OF the CITY OF ST. LOUIS, MISSOURI, Appellant,

v.

The STATE OF MISSOURI; Arthur Mallory, Commissioner of Education of the State of Missouri, in his official capacity; The State of Missouri Board of Education; John Ashcroft, Governor of the State of Missouri; William Webster, Attorney General of the State of Missouri; Wendell Bailey, Treasurer of the State of Missouri; Stephen C. Bradford, Commissioner of Administration of the State of Missouri; The State of Missouri Board of Education and its members, Erwin A. Williamson (President), Jimmy Robertson (Vice-President), Grover A. Gamm, Delmar A. Cobble, Dale M. Thompson, Donald W. Shelton and Robert Welling, Appellees,

Special School District of St. Louis County, Appellee.

Nos. 86–2565, 87–1001 and 87–1705.

United States Court of Appeals, Eighth Circuit.

Submitted July 7, 1987.

Decided Sept. 17, 1987.

Kenneth C. Brostron, St. Louis, Mo., for appellant.

Robert Presson, Jefferson City, Mo., for State of Mo.

Eric Schmitz, St. Louis, Mo., for Special School.

William P. Russell, St. Louis, Mo., for Liddell, plaintiffs.

Michael Middleton, Columbia, Mo., for NAACP.

Before HEANEY, McMILLIAN and FAGG, Circuit Judges.

HEANEY, Circuit Judge.

This matter comes before this Court on appeals by the Board of Education of the City of St. Louis (City Board) and the State of Missouri (State). The NAACP and the Liddell plaintiffs file briefs on the question of class size in the nonintegrated elementary and middle schools in the City of St. Louis.

Several issues are raised on appeal, the most important being: (1) the class size in the nonintegrated elementary and middle schools; (2) implementation of the magnet

school program; (3) increased state funding for a group of special programs titled "A Components in Effect;" (4) responsibility for funding art, music, and physical education programs; (5) the question of whether home economics and industrial arts are remedial programs; (6) interbudgetary transfers of funds; and (7) the proper placement of fiscal responsibility for vocational equipment transferred from the Special School District to the City of St. Louis School District.

On July 7, 1987, we entered an interim order concerning issues number (1) and (2). *Liddell v. Board of Education*, 823 F.2d 1252 (8th Cir.1987) (*Liddell XII* Interim Order). We believe it was imperative that immediate steps be taken by the City Board and the State to implement this Court's long-standing orders regarding class size in the nonintegrated elementary and middle schools. We believe this was necessary to achieve a twenty to one, pupil/teacher ratio by the beginning of the 1988–89 school year. We *restate* in this opinion the substance of our order for the convenience of the parties and the public.

## I. BACKGROUND

In *Liddell v. Missouri*, 731 F.2d 1294 (8th Cir.), *cert. denied*, 469 U.S. 816, 105 S.Ct. 82, 83 L.Ed.2d 30 (1984) (*Liddell VII*), this Court, sitting en banc, set forth in detail the requirements for integrating the St. Louis City schools. To the extent that these requirements are relevant to the issues on this appeal, we highlight them:

(A) Pupil/teacher ratios in the nonintegrated elementary and middle schools were to be reduced to twenty to one by the beginning of the 1987–88 school year. While class size in these schools has been reduced from approximately thirty-five to one in 1984, to approximately twenty-four to one in 1986–87, the City Board states that it could not reach the twenty to one ratio this year because of space and financial constraints.

Pupil/teacher ratios in the high schools and integrated elementary and middle schools were to be reduced to AAA standards. *Liddell VII*, 731 F.2d at 1314–18. This goal has been met.

(B) Fifteen thousand (15,000) black students from the City were to be voluntarily transferred to suburban school districts over a five-year period. *Id.* at 1302. As of the 1986–87 school year, approximately 9,500 students had transferred. On the basis of past experience and applications received for transfers in the current school year, the number of black students transferring to county schools will in all likelihood reach 11,500 during the current school year and can be reasonably expected to reach the 15,000 student goal by the opening of the 1989–90 school year.

(C) Fourteen thousand (14,000) students were to be enrolled in magnet schools— 8,000 in the intradistrict magnets and 6,000 (city and county students) in the interdistrict magnets. *Liddell v. Board of Education*, 804 F.2d 500, 502 (8th Cir.1986) (*Liddell X*). As of the 1986–87 school year, 6,500 students attended intradistrict magnet schools and 2,100 attended interdistrict magnet schools. Of this number, fewer than 600 were students from the county. Magnet school enrollment is not expected to significantly increase in the 1987–88 school year because the parties have been unable to agree upon which programs will be offered and in which facilities they would be offered. In an attempt to improve the quality of the magnet schools and thus reach the goals set forth above, the district court has created the Magnet Panel which is expected to file its report and recommendations in the near future.

(D) Remedial and compensatory programs, along with part-time integrative programs, were to be offered in nonintegrated schools. *Liddell VII*, 731 F.2d at 1314–18. Some of the required programs are now being offered and are adequately funded; others have not yet been offered or are underfunded.

(E) School facilities should be brought up to constitutional standards with the State having the responsibility to fund one-half of the capital improvement costs of the integrated, nonintegrated, and intradistrict magnet schools. The State was to pay *all* the capital costs for the interdistrict magnet schools. The parties were directed to give immediate priority to nonintegrated elementary and middle schools. *Liddell v. Board of Education,* 801 F.2d 278, 284 (8th Cir.1986).

## II. DISCUSSION

### (A) Class Size in the Nonintegrated Elementary and Middle Schools

In the spring of 1987, the City Board asked the district court to provide relief from our order that class size in nonintegrated elementary and middle schools be reduced to a twenty to one ratio by the beginning of the 1987–88 school year. The City Board asserted it had neither the space nor financial resources to make this change. On May 8, 1987, the district court denied the City Board's request, stating: "If the City Board cannot comply with the Eighth Circuit's directive, then it should have sought relief from the appellate court when *Liddell IX* was entered, and, if necessary, can still seek relief from the appellate court. This Court will not interfere with the Eighth Circuit's directive." *Liddell v. Board of Education,* No. 72–100C(5), slip op. (E.D.Mo. May 8, 1987) (L(1422)87). The City Board appeals from this order. The State, the NAACP, and the Liddell plaintiffs urge us to stand fast with our original order.

In our interim order of July 7, 1987, we stated:

On the basis of the briefs and records presented to this Court, it does not appear that the pupil/teacher ratios in the City's nonintegrated elementary and middle schools will be reduced to twenty to one by the 1987–88 school year. It also does not appear that 15,000 black students will have transferred to the county schools or that magnet enrollment requirements will be met by the 1987–88 school year. We re-emphasize that the requirements of *Liddell VII* remain in effect and are to be met at the earliest possible time.

*Liddell XII* Interim Order at 1253–54.

We went on to say, however, that even though the twenty to one goal could not be reached in 1987–88, significant reductions could and should be made by taking certain steps:

At the beginning of the 1987–88 school year, black students currently being transported to nonintegrated schools outside of their attendance zone are to be transferred to those integrated schools in which significantly fewer than 50% of the students are expected to be black. The transfers are intended to bring the percentage of black students in these integrated schools up to about 50% of the student population. The transfers will make some additional space available in the nonintegrated elementary and middle schools for further reduction in pupil/teacher ratios.

*Id.* at 1254.

To provide for the long term means to reach the twenty to one ratio, we held that:

Immediate steps must be taken to insure that facilities meeting constitutional standards are available to meet the twenty to one pupil/teacher ratios in the nonintegrated elementary and middle schools by the beginning of the 1988–89 school year. In this connection, the Court understands that in some classrooms, * * * the ratio may be nineteen to one and in others twenty-one to one. It is the intent of this Court that there be a good faith effort to meet the twenty to

one ratio in each classroom [but] that marginal variances will be tolerated.

*Id.* at 1254.

We prohibited the use of certain steps, however, to reach the twenty to one goal:

The twenty to one pupil/teacher ratio can [*and must*] be reached without split or dual sessions, without displacement of quality education programs in the nonintegrated elementary and middle schools, and without having to transport substantial additional numbers of students.

*Id.* at 1254.

In determining this cost, the fact that the average pupil/teacher ratio in the high schools and integrated elementary and middle schools is lower than that required in *Liddell VII* is not to be given any weight. Although arguments can be made that either the City Board should be required to hire fewer teachers and thereby increase pupil/teacher ratios in the high schools and integrated elementary and middle schools, or that the State's funding obligation should be reduced, we are not willing to require either action. Nonetheless, no further reduction in pupil/teacher ratios in the high schools or in the integrated middle or elementary schools will be allowed until such time as each of the requirements of *Liddell VII* is met in the nonintegrated and magnet schools.

*Id.* at 1255.

We repeat our July 7th order and reiterate to the parties the message that they must plan now so that the twenty to one ratio will be reached by the beginning of the 1988–89 school year.

■ The question then is how many new classrooms and teachers will be required to meet the twenty to one ratio by the 1988–89 school year. On the basis of the experience in the St. Louis schools since the 1982–83 school year, we reasonably expect that the number of students in the nonintegrated elementary and middle schools will not exceed 13,500 (excluding kindergarten students). At a twenty to one ratio, 675 classrooms and 675 teachers will be required. In terms of both categories, this number is approximately fifty more than exist now in the St. Louis school system. The City Board and the State are to share equally in the cost of providing these additional classrooms and teachers.[1]

It is clear that this Court's order in *Liddell IX* with respect to capital improvements in the nonintegrated elementary and middle schools, as restated in our order of July 7, 1987, has not been implemented.

In the July 7, 1987, order, we stated: "[I]mmediate steps must be taken to insure that facilities meeting constitutional standards are available to meet the twenty to one pupil/teacher ratios in the nonintegrated elementary and middle schools by the beginning of the 1988–89 school year." *Liddell XII* Interim Order, at 1254. We also repeat what we said with respect to the construction program and its financing:

[M]any of the nonintegrated elementary and middle schools are very small. For example, sixteen nonintegrated elementary schools have enrollments of fewer than 250 students per school, with an average enrollment of 170 students. The record also reveals that many of the nonintegrated elementary and middle schools are poorly maintained and locat-

---

1. On remand, the district court will require the parties to present current data, so it can determine the precise number of additional classrooms and teachers needed to reach the twenty to one ratio. This determination must be made promptly so that the necessary steps can be taken to meet the goal by the beginning of the 1988–89 school year.

If the desegregation plan is fully implemented in accord with this Court's opinion, the need for the fifty additional classrooms will be temporary, as additional students now attending the nonintegrated elementary and middle schools will continue to transfer to county schools, integrated city schools and magnet schools. This fact may be taken into consideration in determining the improvements that must be made to those classrooms which will only be used temporarily. We re-emphasize, however, that enrollment in nonintegrated elementary and middle schools will in all likelihood exceed 13,500 students and that these schools must fully meet constitutional standards.

ed and would be very expensive to rehabilitate.

In its long-term planning for the nonintegrated elementary and middle schools, the City Board should carefully consider closing the smaller, poorly maintained and poorly located nonintegrated elementary and middle schools and consolidating the students in either new or existing buildings that are well located and designed specifically to meet a pupil/teacher ratio of twenty to one, the goal being to achieve significant operating savings while providing the students with suitable facilities.[1] [Footnote 1: The sixteen smallest nonintegrated elementary schools had average enrollments in 1986–87 of about 170 students in grades one through five. (They have an average projected enrollment for next year, including kindergarten and special education students, of 196.) The sixteen schools had 100 non-teaching personnel (excluding teacher aides), or an average of just over six personnel per school in 1986–87.

The five largest nonintegrated elementary schools had an average enrollment of 448 in 1986–87. (They have an average projected enrollment for next year, including kindergarten and special education students, of 519.) These five schools had an average of just over nine non-teaching personnel (excluding teacher aides) per school. Thus, only three extra non-teaching personnel seem to be needed in elementary schools of more than twice the size. Clearly, substantial economies of scale could be realized, especially when utility and maintenance costs are included, if the small elementary school buildings were replaced with fewer, new or rehabilitated buildings of a larger size.

Moreover, many students in the nonintegrated elementary schools are bused. By basing the building of new schools or the rehabilitation of old schools on projected population trends, the busing of students could be significantly minimized and further savings realized.

Although there are not as many small, older nonintegrated middle schools as elementary schools, certain of these schools could be closed and the student bodies consolidated. For example, Yeatman had an enrollment last year of 439 and a non-teaching staff (excluding teacher aides) of about eleven. Hickey had an enrollment of 215 and a non-teaching staff (excluding teacher aides) of almost ten. A middle school of about twice the enrollment seems to need only about one more staff member to operate it.

Again, when savings from reduced utilities, maintenance, and busing are included, substantial economies of scale could be realized if smaller schools could be consolidated.]

* * * The record further indicates that the City Board closed the 1986–87 school year with a substantial balance that can be used for any educational purpose.[2] [Footnote 2: It is difficult to determine fund balances at the end of the year from the financial records submitted to this Court. Exhibit 11 at page 11 states that the fund balance at the beginning of the 1985–86 school year was $19,995,082 and that the balance had risen to $21,921,516 by the end of the 1985–86 school year. The City Board stated at oral argument that the unencumbered balance at the end of the 1985–86 school year was only $7,074,287. It relied on pages 9 and 10 of Exhibit 11 to support this contention. It conceded that the balance at the end of the 1986–87 school year was about the same as it was at the beginning of the year.]

* * * We direct the district court to determine the amount of this balance and direct that not less than fifty percent of that balance be used to fund a portion of the City Board's share of the cost of providing the facilities set forth in paragraphs B(3) and B(4) of this order. We also direct the parties to determine the annual savings to the City Board from consolidating certain nonintegrated elementary and middle schools as discussed above. These savings are to be earmarked for assisting the City Board in retiring a bond issue necessary to fi-

nance its share of the capital improvements program. If the two sources identified above are insufficient to fund the City Board's $20 million share of a $40 million capital improvements program for the nonintegrated elementary and middle schools, the district court shall enter an order consistent with *Liddell VII*, 731 F.2d at 1319–23, *Liddell v. Board of Education*, 758 F.2d 290, 300–02 (8th Cir.1985) (*Liddell VIII*), and *Liddell v. Board of Education*, 801 F.2d 278, 284 (8th Cir.1986) (*Liddell IX*), to make the resources available to the City Board to retire the remainder of the bond issue.[2]

*Liddell XII* Interim Order at 1254–55.

### (B) Magnet Schools

(1) In regard to the Magnet Panel, we repeat what we stated in our July 7, 1987 order:

We affirm the district court's order re-assigning the responsibilty for developing a magnet school program to the newly constituted Magnet Panel. We further hold that reductions in pupil/teacher ratios in the magnet schools can wait until the Panel develops its long-range plan. (We, however, expect this plan to be completed with dispatch * * *.) We emphasize that an important responsibility of the Panel will be to promptly resolve the disputes between the City Board and the State with respect to the facilities to house the intradistrict and interdistrict magnet schools. The record reveals that to reach the goals established by this Court of increasing the intradistrict magnet enrollment from 6,500 to 8,000, and increasing the interdistrict magnets enrollment from 2,000 to 6,000, the programs must be attractive to county parents and students, and the facilities *must be well located and comparable to facilities in the county schools. Liddell v. Board of Education*, 804 F.2d 500, 503 (8th Cir.1986) (*Liddell*

*X*); *Liddell IX*, 801 F.2d at 283; *Liddell VIII*, 758 F.2d at 299; *Liddell VII*, 731 F.2d at 1311. No delay in providing the necessary facilities is to be countenanced.

We affirm the district court's decision requiring the State to pay one-half the intradistrict magnet specialty costs rather than one-half the general curriculum costs. We again call to the attention of the parties that the State is responsible for the *total operating and capital costs* of the interdistrict magnet schools. [The City Board is not responsible for either.] *Liddell IX*, 801 F.2d at 283; *Liddell VIII*, 758 F.2d at 298; *Liddell VII*, 731 F.2d at 1311.

We note the district court's concern with respect to the opportunities of white city students to attend magnet schools. We point out that when additional facilities are made available, as they must be, there will be space for an additional 750 white students from the City in intradistrict magnets and space for an additional 1,800 white students from the City in the interdistrict magnets.

*Liddell XII* Interim Order at 1255–56.

■ (2) The district court denied the City Board's budget request for increased state funding in all magnet schools with respect to the so-called "A Components" which were in effect as of February 8, 1984. (These programs include Project SHAL; Middle School Math and Science; Elementary School Security Guards; High School Security Guards; Curriculum Office; Curriculum Services; Staff Development-Office; and Staff Development-Other.) *See* L(1426)87 at 5. The Board appeals from that order. We are reluctant to decide this issue at this time, as the Magnet Panel has still not filed its report. To the extent that the Magnet Panel believes the "A Components" are essential in the interdistrict magnets, they shall be includ-

---

**2.** We take judicial notice of the fact that on September 3, 1987, the district court entered a comprehensive memorandum opinion regarding the implementation and financing of a capital improvements program designed to bring all school facilities in the city district up to consti-

tutional standards. We express no opinion as to the merits of that decision, except insofar as it is contrary to our order of July 7, 1987, or to this opinion. To the extent that it is contrary, our opinion and order take precedence and must be strictly implemented.

ed, and the State shall be required to pay their full cost. If the panel finds that some or all of the components are unnecessary, the City Board should not incur expenses for them in the intradistrict magnets. With respect to the intradistrict magnets, the same rule should apply, except that necessary costs must be shared by the City Board and the State. We do note that a number of the components on the list are administrative expenses incurred by central administration. To the extent that the Magnet Panel finds these expenses to be essential, the state shall be required to pay its proper share.

### (C) Art, Music, Physical Education

■ The City Board and the State disagreed with respect to the funding of art, music, and physical education funding. The district court sustained the State's position that the State's AAA requirements are met so long as there is a ratio of one art, music and physical education specialist to each 600 students. *See* L(1426)87 at 4. It further held that AAA standards did not require specialists to teach these subjects to kindergarten students. We affirm the district court's decision with two caveats:

(1) When the class size in the nonintegrated elementary and middle schools is reduced to twenty to one, each specialist in these areas cannot be expected to carry a teaching load of more than 500 students. It would be impractical to consolidate the twenty student classes into larger groups for these classes. The City Board and the State are to share equally the cost of the additional specialists at the time the class sizes are reduced in the nonintegrated elementary and middle schools.

(2) Kindergarten teachers who teach music, art, and physical education must be supervised by teachers with proper certification. *See* DESE Certification Handbook at p. 20. The City Board and the State are to share equally the cost of providing this supervision.

### (D) Industrial Arts and Home Economics

■ The City Board asked the district court to exclude twenty-eight middle school home economics and industrial arts teachers in calculating the number of teachers required to meet established pupil/teacher ratios. The City Board argued that these programs were remedial and compensatory and, thus, were not to be counted in determining whether the court-required pupil/teacher ratios had been reached. The district court disagreed. It held that the teachers in question are regular subject matter teachers. The City Board appeals. We affirm the district court for the reasons stated in its order of May 8, 1987. *See* L(1426)87 at 7–9.

### (E) "Interbudgetary" Transfer of Settlement Plan Funds

■ The City Board requested the district court to permit it to transfer approximately $392,000 from the desegregation account for kindergarten teachers to the desegregation accounts relating to the reduction of the pupil/teacher ratio in the nonintegrated and magnet schools in the 1986–87 school year. The $392,000 had accumulated in the kindergarten account because the Board hired kindergarten teachers for less than the sum budgeted. The State objected. We affirm the district court's denial of the City Board's request. We agree that the City Board failed to demonstrate how it was injured by the district court's denial, as the court ultimately approved a few more teachers for the schools than we had indicated would be necessary to meet a twenty-four to one ratio.

### (F) Fiscal Responsibility for Vocational Equipment

■ A dispute arose over payment for vocational education equipment transferred from the Special School District to the St. Louis School District as a result of the transfer of vocational programs. The Metropolitan Coordinating Committee, the body with responsibility to coordinate vocational education in the St. Louis metropolitan area, recommended to the district court a Memorandum of Understanding which provided as follows:

In the event that one or more programs are moved from one district to the other, the following shall apply:

1. A detailed equipment inventory for each program being moved shall be forwarded to the receiving district by the "sending district" upon transfer.

2. The receiving district shall compensate the sending district for its percentage share of the moved equipment as determined by current Department of Elementary and Secondary Education procedure for disposal of program equipment.

The district court, in an order dated May 13, 1987, *Liddell v. Board of Education*, No. 72–100C(5), slip op at 2. (E.D.Mo. May 13, 1987) (L(1435)87), approved this Memorandum of Understanding, and the City Board appeals. We reverse the district court. In our view, it is contrary to the language and spirit of this Court's decision in *Liddell v. Board of Education*, 822 F.2d 1446 (8th Cir.1987) (*Liddell XI*). The Memorandum of Understanding is also, in our view, contrary to Paragraph 12 of the original 12(b) Vocational Plan, which provides:

Funding for new equipment for unduplicated programs will be provided by the State *except to the extent that funds of either district have already been earmarked for such new programs.* Wherever possible unduplicated programs will be developed from existing equipment, and the committee [MCC] will allocate such programs between the two districts so that neither district is burdened with such program equipment costs unfairly. [Emphasis added.]

In our view, this agreement does not contemplate payment between districts for any equipment that may be transferred. This Court's opinion contemplated that at least one of the county vocational schools would be closed and that new programs would be located at O'Fallon Vocational School in the city. Further, it provided for new vocational programs which would help promote desegregation. Under the revised Memorandum of Understanding, the City Board would be obligated to purchase needed program equipment at a time when it is already under substantial burdens under the school desegregation plan. We, therefore, reverse the district court and order that whenever equipment is available and is needed at O'Fallon to implement approved programs at that school, the equipment should be transferred to the City Board without cost to the City Board.